MACH et al., Appellants and Cross-Appellees,

v.

ACCETTOLA et al., Appellees and Cross-Appellants.

[Cite as *Mach v. Accettola* (1996), 112 Ohio App.3d 282.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 95-L-156.

Decided July 1, 1996.

*Baker, Hackenberg & Collins* and *Richard A. Hennig,* for appellants and cross-appellees.

*Gerald R. Walker,* for appellees and cross-appellants.

FORD, Presiding Judge.

Appellants, Quan Mach and Dung Mach, appeal from a judgment of the Painesville Municipal Court in favor of appellees, Lorrie J. Accettola, Dana Green, and Greg Valko, d.b.a. VAG, Inc., on appellants' eviction claim. Appellees appeal from the judgment granted for appellants on their counterclaim.

On November 9, 1979, appellees entered into a lease with Milford and Phyllis Goldheimer, d.b.a. Lake Investment Company, for property located at 1616 and 1624 Mentor Road in Painesville.[1] Appellants first came into possession of the premises in 1987 as sublessees to appellees.[2] The property was sold twice before

---

1. The lease term is five years and is renewable at the option of appellees.

2. Appellees subleased the other portion of the building to another tenant, Dunkin Donuts, operated by Jay Patel.

appellants purchased the building, subject to the lease, in April 1992. Thus, appellants succeeded to the unique position of owners/lessors and sublessees.

At the time that appellees took possession of the premises in 1979, the roof was leaking and in need of repair. Appellees repaired the roof several times from 1979 to 1993. Beginning in 1993, appellants made several demands on appellees to pay for the replacement of the roof. Appellants eventually replaced the roof in 1994 for $10,400 and demanded full reimbursement from appellees based on the covenant to repair and maintain the premises. Appellees refused to pay, arguing that the covenant did not obligate them to replace the roof.

Appellants filed a complaint for eviction and a claim for damages based on breach of the covenant to repair and maintain. Appellees filed their counterclaim for eviction based on appellants' failure to pay their pro rata share of water expenses and their failure to supply proof of insurance. The trial court granted judgment for appellees on appellants' claim and granted judgment for appellants on appellees' counterclaim.

Appellants timely appealed and raise the following assignment of error:

"The trial court erred to the prejudice of [appellants] in denying their complaint for restitution of premises and termination of lease."

Appellees filed a timely cross-appeal and raise a single assignment of error:

"The [t]rial [c]ourt erred to the prejudice of [a]ppellees in not allowing the [a]ppellees to present evidence on their [c]ounterclaim."

The issue before this court is whether appellees were obligated to pay for the replacement of the roof pursuant to the covenant to repair and maintain. Initially, we examine the provisions in the primary subject lease concerning the respective obligations of appellants, as lessors, and appellees, as lessees:

"10. *USE AND CARE OF PREMISES:* Lessees covenant and agree * * * that during said term they will keep said leased premises and every part thereof and all buildings at any time situated thereon in a clean and wholesome condition * * *.

" * * *

"12. *REPAIRS AND IMPROVEMENTS BY LESSOR:* Lessors shall, at their sole cost and expense, prior to the commencement of the term of this lease accomplish the following:

"(a) Tar and/or otherwise repair the roof of the building on the leased premises so that the same is leakproof and to warrant that the same shall be leakproof for a period of one hundred twenty (120) days from the commencement of the lease.

" * * *

"(d) Other than the foregoing, all obligations of repair and maintenance to the building on the leased premises * * * shall be the obligation of the Lessees, at their sole cost and expense.

"(e) *Lessor shall repair and/or replace* and paint existing guard rail on south line of front parking area and install and paint new or used guard rails in new rear parking area, if required to obtain an occupancy permit from Painesville Township zoning authorities.

"13. *REPAIRS AND MAINTENANCE BY LESSEE:* (a) Lessees shall, at their sole cost and expense, maintain the building situated on the leased premises including but not limited to plumbing, heating, electrical, air conditioning facilities, roof, windows, glass and doors which are installed on the leased premises.

" * * *

"22. *SURRENDER OF POSSESSION:* * * * Lessee covenants and agrees that it will at once surrender and deliver up said premises, including the buildings * * * peaceably to Lessor *in as good condition as when Lessee took possession,* ordinary wear and tear * * * excepted." (Emphasis added.)

Significantly, the lease is silent concerning whether appellees are responsible for replacements.

The rules of construction applicable to leases have been stated as follows:

"Contracts, as in this case a lease agreement, must be given a just and reasonable construction in order to carry out the presumed intent of the parties * * *. The intent of the parties to a contract is presumed to reside in the language they chose to employ in it. * * *

"In construing written agreements, the language and terms therein are to be given their plain, common, and ordinary meaning. * * * The document must be read as a whole and construed most strongly against its author.* * * " (Citations omitted.) *Buckeye Union Ins. Co. v. Consol. Stores Corp.* (1990), 68 Ohio App.3d 19, 24–25, 587 N.E.2d 391, 394–395.

In construing the tenant's covenant to repair, we find instructive the approach adopted in the Restatement of the Law 2d, Property (1977) 497, Section 13.1, Comment *c:*

" * * *A promise by the tenant to keep the leased property in repair, unless the language of the promise clearly provides otherwise, does not obligate the tenant to make repairs other than those that are the result of ordinary wear and tear on the leased property.* * * "

Additional guidance for construction of the landlord's obligation concerning repairs is found in Section 5.6, Comment *d:*

" * * *An agreement, express or implied, which undertakes to decrease a landlord's obligations in regard to the condition of the leased premises, will be construed strictly against the landlord. In other words, the extent of the decrease will be kept in as narrow a range as is consistent with the terms of the agreement entered into by the parties."

Illustration 1 to Comment *d* further provides:

" * * * The extent to which the promise shifts the responsibility for the condition of the premises to the tenant from what it otherwise would be is to be given a strict interpretation. If a more extensive shift is intended, it is the responsibility of the landlord to spell this out in the agreement between the parties.* * * "

The definitions of the terms "repair" and "renewal" were construed by the Sixth District Court of Appeals in *Knickerbocker Bldg. Serv., Inc. v. Phillips* (1984), 20 Ohio App.3d 158, 20 OBR 192, 485 N.E.2d 260, where the court stated that "repair" " 'naturally means a restoration approximately to the original condition, taking into consideration natural wear and tear and the ordinary action of the elements. The term means to renew or restore an existing thing, and not to make a new one. It may be observed, however, that the term "repair" and the term "renew" are not expressive of a clear contrast. Repair frequently involves a renewal of a subordinate part. It is a restoration by renewal or replacement of subsidiary parts of a structure. As distinguished from repair, renewal is a reconstruction of the entirety or a substantial part of the whole.' (Footnotes omitted.) Annotation, Extent of Lessee's Obligation under Express Covenant as to Repairs (1926), 45 A.L.R. 12, 42–43." (Footnote omitted.) *Id.* at 162, 20 OBR at 197, 485 N.E.2d at 265.

In *Riverside Builders, Inc. v. Bowers* (June 7, 1990), Franklin App. No. 89AP–834, unreported, 1990 WL 75433, the court stated that "[g]enerally, the difference between a repair and an improvement is that the former preserves the original condition of the property while an improvement enhances the property's value by a permanent addition. * * * Whether the work is a repair or an improvement is normally a factual question."

The term "maintain" is defined as "to keep in a state of repair." Webster's Third New International Dictionary (1986) 1362. To "replace" means "to put in place of" or to "provide a substitute or successor for." *Id.* at 1925.

In *Call v. Lavati Chevrolet–Buick, Inc.* (Apr. 23, 1992), Crawford App. No. 3–91–36, unreported, 1992 WL 81425, the lessor sought reimbursement from the former lessee for the new roof, new heaters, and repaving of a parking lot. The maintenance and repair covenant was similar to the one in the instant case, but included two additional phrases: "Lessee shall keep and maintain the entire

exterior and interior of the leased premises * * * *in good condition and repair, including any necessary replacements* * * *." (Emphasis added.) The lessor argued that the covenant required the lessee not only to maintain and repair as necessary, but also to make replacements. The Third District Court of Appeals rejected that argument, and held:

"Appellant contends that the phrase 'including any necessary replacements' established [a]ppellee's duty to make significant replacements of deteriorated structural components on the leased premises, such as a new $50,000 roof. However, when read in a grammatically correct manner, that phrase is clearly understood to modify the duties to 'keep and maintain * * * the leased premises (including newly replaced construction and fixtures) in good condition and repair.' We reject [a]ppellant's convolution of the clear modifying language of the 'maintenance and repair' provision of this contract. This language requires the lessee to 'keep and maintain' any necessary replacements in good condition and repair after the replacements are made, but it does not require the lessee to make those replacements initially. Despite [a]ppellant's claims that his own intent was for the tenant to install 'replacements' where old construction was 'worn out,' we find that such interpretation of a covenant to repair would be unreasonable, and contrary to law where such a duty was never expressly assumed by the lessee.

" * * * We conclude that, if the parties understood that [a]ppellee was assuming the duty to completely replace the pavement in the parking lot, re-roof the building, or replace the faulty heating system, the extensive lease agreement, approximately thirty pages in length, and drafted by appellant's own attorneys, would have specified such duty.* * * *"

In *Kaufman v. Shoe Corp. of Am.* (1960), 24 Ill.App.2d 431, 435–436, 164 N.E.2d 617, 620, the court held:

" * * * A general covenant of the tenant to repair, or to keep the premises in repair, merely binds him to make the ordinary repairs reasonably required to keep the premises in proper condition; it does not require him to make repairs involving structural changes. In order to shift on the tenant a burden which would naturally fall on the landlord, the warrant for the change should be plainly discoverable in the lease.* * * *" See, also, *Mobil Oil Credit Corp. v. DST Realty, Inc.* (Mo.App.1985), 689 S.W.2d 658.

After reviewing the record and case law, we concur with the trial court's conclusion that the costs of replacing the roof fell upon appellants. We reach this conclusion based on several factors. The condition of the roof at the time that appellees took possession is significant. "An ordinary covenant of 'good repair' does not include replacement of a roof which has become so run down that it

cannot be repaired." *Sandelman v. Buckeye Realty, Inc.* (1991), 216 Ill.App.3d 226, 230, 160 Ill.Dec. 84, 86, 576 N.E.2d 1038, 1040.[3]

In the instant case, the roof had been in poor condition since 1979. Appellee Accettola testified that the original lessors had failed to leakproof the roof as they had promised under section 12(a) of the lease, and that the roof had begun leaking within a few months after he took possession of the premises in 1979. Accettola further testified that in 1979 the roofing contractor who made the repairs at that time informed him that the roof was in a deplorable condition and that patching was only a temporary remedy. He also stated that he hired a roofing contractor to make extensive repairs to the roof in 1986. Subsequently, patch repairs were made as needed.

It is evident that appellees complied with their responsibility to repair and maintain the roof by having the roof patched. However, the replacement of the roof in 1994 was analogous to a renewal, as defined in *Knickerbocker*, rather than a repair. The roofing contractor testified that he had replaced the entire roof because repairs alone would not have prevented further damage to the building. "[A]n express covenant to repair will not be enlarged by construction." *Hollywood Bldg. Corp. v. Greenview Amusement Co.* (1940), 315 Ill.App. 658, 661, 43 N.E.2d 566, 567. We read the lease language in the instant case as requiring appellees to make ordinary repairs, but we do not construe "repair" or "maintenance" to mean replacement of the roof which was completely worn out.

The contract, a fifteen-page document, was silent concerning whether appellees were responsible for replacements which were substantial and structural in nature. The term "replace" was used once to refer to the lessors' obligation to replace the guard rail. "The total absence of a provision from a written contract is evidence of an intention of the parties to exclude it rather than of an intention to include it." *Buckeye Union Ins. Co.*, 68 Ohio App.3d at 25, 587 N.E.2d at 395. In the absence of any express language requiring appellees to make replacements of a substantial, structural nature, we decline to create such an obligation.[4]

---

3. "[A] fair construction of a lease requiring maintenance and repair was that lessee undertook to keep the property during the term and to surrender it at the end of the term in as good condition as when received excluding depreciation or reasonable use for the purposes contemplated by the lease." *Jacobi v. Timmers Chevrolet, Inc.* (1982), 164 Ga.App. 198, 199, 296 S.E.2d 777, 779.

4. In *Hampers v. Darling* (1960), 194 Pa.Super. 59, 62, 166 A.2d 308, 310, the court held that "[t]he parties here limited the obligation to maintain and keep in good repair. This did not include replacement. If the parties had so intended, they would have used the word 'replace' and any ambiguity as to meaning would have been clear. * * * The parties, having made their contract, cannot ask the court to make a new one for them to include the obligation to replace."

The short-term nature of the lease itself is also important. The net lease at issue here has a five-year term.[5] The roofing contractor testified that the new roof would have an estimated useful life of approximately fifteen to twenty years. Thus, the roof will probably last until 2009 or 2014, well beyond the termination of the current lease term in 1999. In this situation, it would be inequitable to require appellees to pay the cost of replacement when the useful life of the roof would likely extend beyond the end of the lease term. See *Mobil Oil Credit Corp.*, 689 S.W.2d at 662.

Construing the contract language most strongly against appellants, we conclude that appellees did not breach the covenant to repair. Where the lease language is silent, the alterations are structural and substantial, the roof's condition is poor from the inception of the lease and not due to neglect or damage by the lessee, and the useful life of the roof extends well beyond the lease term, the lessor is responsible for replacement of the roof. Accordingly, the trial court properly held that there was no proper basis to terminate the lease. Appellants' assignment is without merit.

■ Turning to appellees' cross-appeal, appellees assert that the trial court improperly denied them the opportunity to present evidence concerning appellants' alleged failure to keep the premises in a "clean and wholesome" condition. Appellees argue that the trial court should have received the evidence, even though this particular language did not appear in their counterclaim.

Appellees' argument is not well taken. Civ.R. 8(A) requires a short, plain statement of a claim. The original and amended counterclaim each contained two allegations, failure to supply proof of insurance and failure to pay expenses, but did not include any allegation of failure to keep the premises in a clean and wholesome condition. Additionally, the attachments to the original and amended counterclaim, titled "Notice to Leave the Premises," did not contain any such reference.[6] Thus, appellees failed to meet the minimal requirements of Civ.R. 8(A).

We note that appellees timely objected to the trial court's decision, but never moved to amend the pleadings to conform to the evidence pursuant to Civ.R.

---

5. Appellees' current monthly rental payment, $1,800 is not subject to any deductions for insurance, taxes, utilities, or repair and maintenance costs. Appellants pay the real estate taxes and are reimbursed by appellees.

6. Appellees aver that an eviction notice dated July 25, 1994 included appellants' failure to keep the premises in a clean and wholesome condition as one of its grounds for eviction. We have conducted a thorough examination of the record and have failed to discover the existence of any such notice.

15(B). The rule governing the trial court's discretionary authority in this situation was set forth by this court in *Bright v. E & C Lyons* (Sept. 30, 1993), Geauga App. No. 93–G–1753, unreported, 1993 WL 407361, where we held that:

"When there is an objection to evidence offered because it is outside the pleadings, the trial court shall allow an amendment provided the two-prong test is satisfied:

" '(1) * * * the presentation of the case's merits will be subserved thereby, and (2) the objecting party does not satisfy the court that admission of the evidence would prejudice him in maintaining his case upon the merits.' *Hall v. Bunn* (1984), 11 Ohio St.3d 118, 121 [11 OBR 417, 420, 464 N.E.2d 516, 519–520]."

However, the complaining party must submit a motion to trigger this procedural mechanism. Civ.R. 15(B). Although the trial court did not expressly state its reason for sustaining appellants' objection to the proffered evidence, apparently the trial court decided that appellants would be prejudiced by the evidence due to lack of notice. We perceive no error under these circumstances because appellees failed to submit the additional allegation in their counterclaim or amended counterclaim. We conclude that the trial court did not abuse its discretion in denying the evidence proffered by appellees concerning appellants' alleged failure to keep the premises in a clean and wholesome condition. Accordingly, because this claim is not properly before us, we overrule appellees' assignment. *Motorists Mut. Ins. Co. v. ADT Sec. Systems* (Aug. 4, 1995), Montgomery App. Nos. 14799 and 14803, unreported, 1995 WL 461316.

Appellants' assignment of error and appellees' cross-assignment of error are without merit. The judgment of the trial court is affirmed.

*Judgment affirmed.*

CHRISTLEY and NADER, JJ., concur.