## STATLER ARMS. INC.

v.

## APCOA, INC.

Court of Common Pleas of Ohio,
Cuyahoga County.

No. 310753.

Decided Oct. 17, 1997.

*Cavitch, Familo, Durkin & Frutkin, Michael C. Cohan* and *Ronald D. Holman II,* for plaintiff.

*Calfee, Halter & Griswold, Bruce J. Lowe* and *Thomas I. Michals,* for defendant.

———————

ANTHONY O. CALABRESE, JR., Judge.

The claims in this action center around the interpretation and construction of a maintenance and repair clause in a commercial lease for a parking garage with a term of forty-two years.

## I. PROCEDURAL FACTS

This case comes before the court upon the motion for summary judgment filed July 15, 1997, by plaintiff, Statler Arms. Inc. ("Statler"), the lessor of the subject property.[1]  Attached to said motion was the affidavit of Carl Milstein.[2]  On October 6, 1997, Statler filed a supplemental affidavit by Myron Charna.  In its

———————

1.  Pursuant to an unopposed motion filed by Trebmal Construction, Inc. on February 20, 1997, Statler Arms, Inc. was substituted as the plaintiff in this case.

2.  APCOA's request to strike the affidavit of Carl Milstein, contained in its cross-motion for summary judgment, is denied.

motion, Statler requests that this court enter summary judgment in Statler's favor and against defendant, APCOA, Inc. ("APCOA"), the lessee, based upon a finding that APCOA is liable to maintain and repair (without limitation) the Parking Garage pursuant to a commercial lease.

Also before the court is APCOA's cross-motion for partial summary judgment, which was filed October 2, 1997. In its motion, APCOA seeks summary judgment (on its counterclaim) declaring that (1) APCOA is required only to make repairs to maintain a safe parking facility, (2) Statler is obligated to undertake any substantial or structural repairs necessary to comply with certain building violations issued by the city of Cleveland, and which exceed APCOA's responsibilities, (3) APCOA has no duty to perform repairs and improvements which are not necessary to maintain the facility through the end of the lease term, and (4) at the termination of the lease, APCOA is required only to surrender a parking garage which is in the same general condition as when the lease was commenced, with exceptions for ordinary wear and tear. APCOA attaches the affidavits of Walter Stuelpe, Armand Gustaferro, and Jeffery Wetshtein, excerpts from the deposition transcript of Milstein, a lease document, and other exhibits to its motion.

In further support of their respective positions, the parties have filed with this court the deposition transcripts of Carl Milstein, Myron Charna, and Herbert Anderson, and copies of the relevant lease documents. Counsel for both parties also have presented oral arguments to the court.

Statler commenced this action against APCOA on June 21, 1996. In its complaint, Statler alleged that it was the owner and/or lessor of certain real property consisting in part of the Ballroom and Parking Garage at the Statler Office Tower and a portion of the Statler Office Tower in downtown Cleveland.[3] It was also alleged that APCOA leased from Statler certain space, namely the Statler Office Tower Parking Garage and other areas. In support of its allegations, Statler attached the following documents to the complaint:

A. Indenture of Lease, dated May 15, 1915, between Hotel Statler Company, Inc. ("Lessor") and the Stillman Amusement Company ("Lessee");

B. Amendment to Lease, dated September 4, 1963, between Hilton Hotels Corporation ("Lessor") and Airport Parking Company of America ("Lessee") (hereinafter, sometimes referred to as the "Parking Garage Lease"); and

---

3. The court notes that the Statler Office Tower is a large, multi-floor office building in downtown Cleveland, located at the corner of Euclid Avenue and E. 12th Street. The Statler Parking Garage is a seven-floor structure attached or adjacent to the Office Tower.

C.  Modification to Amendment to Lease, dated August 5, 1964, between Hilton Hotels Corporation ("Lessor") and Airport Parking Company of America ("Lessee").

Statler attached to the affidavit of Myron Charna the Ballroom Lease dated August 5, 1964 between Airport Parking Company of America ("Lessor") and Hilton Hotels Corporation ("Lessee").  These various leases are sometimes hereafter referred to, collectively, as the "Lease Documents."  In its amended complaint, Statler asserts two causes of action for money damages and a cause of action for forcible entry and detainer.  The gravamen of Statler's action is that APCOA has failed to satisfy the terms and conditions of a maintenance and repair clause.  Specifically, Statler relies upon Section 5 of the Amendment to Lease, which provides in full as follows:

"<u>Maintenance and Repair</u>.  Lessee, at its own expense, will keep the leased premises and the improvements located on Parcel No. 1 and the basement and the first and second floors of the building located on Parcel No. 2 clean and in good order and condition at all times during the term of the Lease, and make all necessary or appropriate repairs, replacements and renewals thereto.  All such repairs, replacements and renewals shall be of a quality at least equal to that of the original work.  In case of any material part thereof, Lessee will promptly give written notice thereof to Lessor and will, at its expense, and whether or not the insurance proceeds, if any, shall be sufficient for the purpose, restore, repair or rebuild the same as nearly as possible to its prior condition and character immediately prior to such damage or destruction."

In its answer to amended complaint and counterclaim, which was filed on August 20, 1997, APCOA largely denied the allegations contained in the amended complaint, set forth various affirmative defenses, and asserted claims for money damages and declaratory judgment.

On July 15, 1997, Statler filed the motion for summary judgment, which is now before this court for consideration.  On August 15, 1997, Statler filed its motion for accelerated briefing schedule and ruling on Statler's motion for summary judgment and/or for accelerated trial schedule, which APCOA opposed by brief. At a pretrial conference with counsel for Statler and APCOA on August 27, 1997, this court granted Statler's motion and ordered APCOA to file its brief in opposition to said motion on or before October 3, 1997.  This court further set a hearing for oral arguments on the same date.

On September 23, 1997, APCOA sought leave to file a cross-motion for partial summary judgment, which was unopposed by Statler.[4]  APCOA then filed its

---

4.  At oral arguments on October 3, 1997, counsel for Statler represented to the court that it did not oppose the filing of the cross-motion for partial summary judgment, and leave to file the motion was granted to APCOA at that time.

cross-motion for partial summary judgment on October 2, 1997.[5]

## II. SUBSTANTIVE FACTS

Statler and APCOA, the respective plaintiff and defendant in this action, are commercial parties. Statler is the lessor and APCOA is the lessee of the Parking Garage which lies at the center of this dispute. In order to appreciate fully the relationship between the parties and the language in dispute, it is necessary to review the background of four leases going back in time several decades.

The first relevant lease is the Indenture of Lease, which was executed on May 15, 1915 by predecessors to both Statler and APCOA. This lease created a ninety-nine-year tenancy for the real property that would later become known as the Statler Office Tower and Parking Garage—the subject matter of this litigation. It will expire in the year 2005. Thus, there are approximately eight more years left on this lease.

The second relevant lease is the Amendment to Lease, which was executed on September 4, 1963 by APCOA (as successor-in-interest to the lessee in the Indenture of Lease) and Hilton Hotels Corporation (as predecessor-in-interest to Statler). This document contains the operative clause which the parties have asked this court to interpret. In the Amendment to Lease, APCOA agreed to demolish an existing facility and to construct, at its sole expense, the parking facility which is the subject of this litigation. (APCOA also retained the option to build an exhibition hall.) The Lease is a triple net lease, meaning that APCOA was required to assume responsibility for such things as insurance, taxes, and repairs. The Lease did not impose any obligations for maintenance or repair upon the lessor. As outlined above, the Amendment to Lease contains the operative clause which surrounds this litigation—Section 5 of the Lease.

Pursuant to this section, the term "improvements" refers to the Parking Garage which APCOA agreed to build. This lease language does not provide for any exception for ordinary wear and tear. Similarly, there is no "surrender" clause in the document. The Amendment to Lease made clear that, with the exception of the foregoing modifications, all terms and provisions of the Indenture of Lease would remain in full force and effect.

The third relevant lease document is the Modification to Amendment to Lease, which was executed nearly one year later, on August 5, 1964, again by Hilton Hotels and APCOA. Apparently in the intervening year after the Amendment to Lease was signed, the parties decided to build a parking garage and ballroom

---

5. The counts for declaratory judgment seek to have this court render determinations on the meaning and effect of certain terms and conditions contained in the lease documents. One of these counts serves as the basis for APCOA's cross-motion for partial summary judgment.

facility, rather than a parking garage and exhibition hall facility. The Modification to Amendment to Lease indicates that, with the exception of modifying the facility, "all the terms and provisions of the Lease [which included the Indenture of Lease] shall remain in full force and effect."

The fourth lease document of relevance to this action is the Ballroom Lease, which was signed on the same day as the parties executed the foregoing Modification to Amendment to Lease. The lessor and lessee are reversed in the Ballroom Lease. As such, APCOA is the lessor and Statler's predecessor-in-interest is the lessee under the Ballroom Lease. In this agreement, APCOA leased the Ballroom to Statler's predecessor. The Ballroom Lease also sets forth the maintenance and repair obligations, some of which were assumed by APCOA and others by Statler's predecessor. These terms are very different from the repair and maintenance clause in the Amendment to Lease. Significantly, in the Ballroom Lease, Statler's predecessor agreed, at its sole cost and expense, to maintain and keep the interior of the Ballroom in a state of good repair and condition. By contrast, APCOA agreed, at its sole cost and expense, to make all necessary structural repairs to any supporting or bearing walls, floors, beams, or columns in the interior of the ballroom and also to the roof and exterior walls.

In approximately 1979, Trebmal (the predecessor-in-interest to Statler and the original party to this action) acquired the subject property and became the lessor for the Parking Garage. Statler claims that APCOA has not maintained and repaired the garage as required by Section 5 of the Amendment to Lease. It also says that it lodged complaints about the condition of the garage with APCOA, but they went unanswered. In response, APCOA claims that it has performed repairs and maintenance.

Statler has served APCOA with two notices of default (dated December 15, 1995 and February 28, 1997), indicating that the latter is in default of its obligations under the lease documents and demanding that APCOA cure the defaults.[6]

On or about January 30, 1997, the city of Cleveland served a notice of violation of building ordinances ("Notice of Violation") upon Statler which identified various violations with respect to the subject parking garage. On that same day,

---

6. The notices of default given by Statler to APCOA indicate that the following conditions of disrepair exist at the Parking Garage: concrete spalling; exposed and corroded structural steel; exposed and corroded reinforcing steel rebar; loose concrete on the upper reaches of the parking decks; delaminations of the parking surfaces; water intrusion and leakage; visible salt accumulation and water intrusion in the exposed concrete columns and soffits; blocked and otherwise insufficient drains causing ponding of water; unrepaired collision damage resulting in cracked concrete; failing temporary and cosmetic repairs of significant and recurring problems further contributing to and resulting in the present condition.

counsel for Trebmal sent a letter to counsel for APCOA which enclosed a copy of the Notice of Violation and directed APCOA to take corrective measures. However, on March 5, 1997, the city commenced criminal action against Statler with respect to these matters in Cleveland Municipal Court (before the Honorable Raymond Pianka) and issued a summons thereon.[7] APCOA has purported to take partial measures to comply with the Notice of Violation, which the city of Cleveland has deemed to be inadequate and deficient. These proceedings are still pending.[8]

### III. ANALYSIS

#### A. Summary Judgment

Rule 56(c) of the Ohio Rules of Civil Procedure sets forth the standard for entry of summary judgment:

"Summary Judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, so that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

It is well established in Ohio law that the entry of summary judgment is appropriate only where reasonable minds can come to but one conclusion and that conclusion is not favorable to the party against whom the motion for summary judgment is made after having the evidence construed most strongly in his favor. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

■ In that Statler has filed its motion for summary judgment and APCOA has filed its cross-motion for summary judgment—based upon the very same maintenance and repair clause but different legal interpretations—both sides appear to concur that this case is appropriate for summary judgment. This court agrees.[9] There is no genuine issue as to any material fact and judgment shall be

---

7. This case is (mistakenly) entitled *City of Cleveland v. Steven Fein* and it is case No. 97 CRB 008519 in the Housing Court of the Cleveland Municipal Court. That case includes a Notice of Violation from the city of Cleveland, Department of Community Development, Division of Building and Housing, dated January 30, 1997, to Statler Arms, Inc. and Prestige Management Company, Inc., seeking compliance with certain specified violations by March 2, 1997.

8. Pursuant to Ohio Rule of Evidence 201, the court takes judicial notice of the existence of the housing court case referred to by the parties. Judicial notice was requested by Statler during oral argument.

9. The court disagrees with APCOA's assertion that Statler's motion for summary judgment will not advance the case. Statler seeks an interpretation of the Lease. This is appropriate for a

entered in this case as a matter of law. It is appropriate and proper for this court to enter summary judgment in an action involving the construction of contract language. *Stow v. Summit Cty.* (1990), 70 Ohio App.3d 298, 590 N.E.2d 1363; *Fireman's Fund Ins. Co. v. Mitchell–Peterson, Inc.* (1989), 63 Ohio App.3d 319, 578 N.E.2d 851.

### B. Lease Interpretation

A threshold question that must be determined by the court is whether the Maintenance and Repair provision of the Lease is ambiguous. If it is ambiguous, then extrinsic evidence would be admissible to interpret that provision. *Carroll Weir Funeral Home, Inc. v. Miller* (1965), 2 Ohio St.2d 189, 31 O.O.2d 402, 207 N.E.2d 747. If the court finds that the Lease provision is not ambiguous, then extrinsic evidence must not be considered by the court in determining the meaning of the Lease provision. *Carroll Weir Funeral Home, Inc. v. Miller, supra.* Whether the Lease or a provision of the Lease is ambiguous is a question or matter of law, to be determined by the court. *Call v. Lavati Chevrolet Buick, Inc.* (Apr. 23, 1992), Crawford App. No. 3–91–36, unreported, 1992 WL 81425. In this case, both Statler and APCOA are seeking summary judgment on the meaning of the Lease and/or Maintenance and Repair provision of the Lease. Implicit in the motion of each party is a contention or admission that the Lease and/or Lease provision is not ambiguous and a request for the court to declare the meaning of the Lease and/or Lease Provision. The court agrees that the Lease and/or Lease Documents are not ambiguous.

In interpreting the meaning of the Lease and/or Lease Provision, the court is guided by well-established principles of Ohio law. The construction of written contracts is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus; *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 628 N.E.2d 1377; *Latina v. Woodpath Dev. Co.* (1991), 57 Ohio St.3d 212, 567 N.E.2d 262. Lease interpretation is generally considered to be a matter of carrying out the intent of the parties. The intent of the parties is presumed to reside in the language of the lease or contract. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 667 N.E.2d 949; *Buckeye Union Ins. Co. v. Consolidated Stores Corp.* (1990), 68 Ohio App.3d 19, 587 N.E.2d 391. If the court determines that a lease or contract is not ambiguous, then the court cannot consider any extrinsic or parol evidence that would allegedly reflect the intention of the parties. In other words, if the

---

motion for summary judgment. APCOA also seeks an interpretation of the Lease on a motion for summary judgment, which includes the complaint and the counterclaim for declaratory judgment. Whether such Lease interpretation is based on the complaint, the counterclaim for declaratory judgment, or either or both of the motions of the parties is irrelevant.

lease is not ambiguous, even if the actual intent of the parties at the time of execution of the lease is different from what is shown by the clear and unambiguous language of the lease, the actual intent of the parties is irrelevant. *Call v. Lavati Chevrolet–Buick, Inc., supra.*

The case law in Ohio has consistently upheld the principle that in construing contracts or leases, the language and terms therein are to be given their plain, common, and ordinary meaning. *Buckeye Union Ins. Co. v. Consolidated Stores Corp., supra; Winningham v. N. Am. Resources Corp.* (C.A.6, 1994), 42 F.3d 981; *Libbey–Owens–Ford v. Ins. Co. of N. Am.* (C.A.6, 1993), 9 F.3d 422; *Point E. Condominium Owners' Association, Inc. v. Cedar House Assoc.* (1995), 104 Ohio App.3d 704, 663 N.E.2d 343; *Saydell v. Geppetto's Pizza & Ribs* (1994), 100 Ohio App.3d 111, 652 N.E.2d 218; *Fireman's Fund Ins. Co. v. Mitchell–Peterson, Inc., supra.*

Giving the words in the contract or lease their plain, common, and ordinary meaning carries out the intent of the parties. *Alexander v. Buckeye Pipe Line Co., supra.* If an interpretation of the lease or contract varies from the ordinary meaning of the language used in the lease or contract, the court would be, in effect, creating a new contract, which would be error.

The fact that a contact or lease is silent on a particular point does not make it ambiguous. *Washington Univ. v. Royal Crown Bottling Co.* (Mo.App. 1990), 801 S.W.2d 458. On the other hand, silence on a particular point or the total absence of a provision from a contract or lease is evidence of an intention of the parties to exclude this item from the contract or lease, rather than evidence of an intention to include it. *Buckeye Union Ins. Co. v. Consolidated Corp., supra.*

In construing contracts, courts should not, under the guise of doing substantial justice, ignore the agreement of the parties by making a contract of its own; there must be some legal basis for the execution of such power. *Conday v. Stone* (1925), 3 Ohio Law Abs. 605. It is not the responsibility or function of the court to rewrite the parties' contract in order to provide for a more equitable result. *Enviresponse v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 678 N.E.2d 519.

In order to declare the meaning of a contract or lease, the court must consider the document as a whole. *J.G. McCrory Ohio Co. v. Rabbitts* (1922), 105 Ohio St. 521, 138 N.E. 56; *Steiner v. Minkowski* (1991), 72 Ohio App.3d 754, 596 N.E.2d 492. Reading the document as a whole gives it a just and reasonable construction, which carries out the intent of the parties. *Buckeye Union Ins. Co. v. Consolidated Corp., supra; Monsler v. Cincinnati Cas Co.* (1991), 74 Ohio App.3d 321, 598 N.E.2d 1203.

The interpretation of the Lease as a whole requires the court to consider whether the lease is a net lease or as they are more commonly called, a triple net lease. In a triple net lease, the tenant assumes most of the obligations related to the premises. The fact that a lease is a triple net lease is reflective of the intent of the parties when disputes arise over obligations related to the premises. These leases were succinctly described in this context as follows:

"The lease in this case is known informally as a 'triple net' lease. Its purpose is to encourage investment in commercial and rental properties which have a potentially high return, while simultaneously drawing long-term commercial tenants who are attracted by the relatively cheap rent, which trial testimony has revealed was approximately one dollar per square foot. In return for the benefit of inexpensive rent, the tenant assumes the obligation of paying certain costs, including property insurance, repairs, replacements and general maintenance, and taxes. The nature of such an agreement constitutes a reflection of that for which the parties bargained; consequently, it must be construed with reference to its object or purpose. This principle is well established in Ohio law. *The Mills–Carleton Co. v. Huberty* (1990), 84 Ohio St. 81, 86, 95 N.E. 383; 18 Ohio Jurisprudence 3d, Section 138." *Cibralter Ltd., #1 v. Tossco Distributors, Inc.* (Sept. 17, 1982), Lucas App. No. L–82–069, unreported, 1982 WL 6567.

Since the court finds the Lease Documents in this case to constitute a triple net lease, these principles are relevant.

## C. Review of Lease Document As a Whole

Statler contends that Section 5 of the Amendment to Lease requires APCOA to do all maintenance and repairs at the Parking Garage regardless of the nature of the repairs. For its position, Statler primarily relies on the language of the Lease, a consideration of the Lease as a whole, and the comparison of this provision to the maintenance and repair provision of the Ballroom Lease. APCOA acknowledges that it has an obligation to maintain the Parking Garage and to do certain repairs at the Parking Garage. APCOA contends, however, that it is required to do only repairs that are necessary and appropriate to maintain the Parking Garage in a safe and operable condition for the balance of the Lease term. For its position, APCOA relies on the language of the Lease and a contention that the language of the Lease is not specific enough to impose upon it an obligation to make major repairs at the Parking Garage. In support of their respective positions, each party has presented to the court extensive case authority on issues regarding lease interpretation and repair covenants contained in leases. Included in these presentations was an exhaustive review of dictionary and case-law definitions of many of the terms found in the repair covenant of the Lease. The court has reviewed and considered all of these materials.

Before discussing the Maintenance and Repair Provision of the Lease, the court must first review its conclusions with respect to the lease documents as a whole. The court has made a detailed review of the lease documents and finds the following significant items reflected by these documents:

1. The Amendment to Lease was executed on September 4, 1963. The Lease for the Parking Garage runs from that date to June 30, 2005, a period of approximately forty-two years. The Modification to Amendment to Lease was executed on August 5, 1964.

2. Pursuant to the Amendment to Lease, APCOA was required to construct a Parking Garage and an Exhibition Hall. Pursuant to Modification to Amendment to Lease, APCOA's obligation to construct an Exhibition Hall was replaced with an obligation to construct a Ballroom. All other provisions of the Amendment to Lease were reaffirmed at that time.

3. APCOA is the original and only lessee or tenant under the lease documents. Statler is successor-lessor.

4. APCOA is required to provide insurance for the Parking Garage.

5. APCOA is required to pay the real estate taxes related to the Parking Garage.

6. There is a Maintenance and Repair provision in the Lease which requires APCOA to keep the Parking Garage clean, in good order, and in good condition. This provision also requires APCOA to make all necessary or appropriate repairs, replacements, and renewals to the Parking Garage.

7. The Maintenance and Repair provision also provides that in the event of any material destruction of the Parking Garage, or a substantial portion thereof, APCOA is obligated to restore, repair, or rebuild the Parking Garage as nearly as possible to its prior condition and character.

8. The Maintenance and Repair provision of the Lease does not contain any language that imposes an obligation for repair, replacement, and renewals of the Parking Garage onto Statler.

9. The Maintenance and Repair provision of the Lease does not contain an exception for ordinary wear and tear.

10. There is no "surrender" clause in the Lease.[10]

11. There are approximately eight years left on the Lease.

---

10. Typically, commercial leases contain a surrender clause which provides that upon expiration of the term of the lease, the tenant is required to return the premises to the landlord in the same condition that the premises were in at the beginning of the lease, subject to ordinary wear and tear.

12. Based on the Lease as a whole, this Lease would be considered a triple net lease, with Statler as the lessor and APCOA as the lessee.

13. The Ballroom Lease is dated August 5, 1964, the same date as the Modification to Amendment to Lease for the Parking Garage. The parties are reversed in the Ballroom Lease: APCOA is the lessor and Statler is the lessee.

14. The Ballroom Lease contains a maintenance and repair clause that is significantly different from the maintenance and repair clause in the Parking Garage Lease. In the Ballroom Lease, the parties placed certain obligations for maintenance and repair onto Statler, and certain obligations for maintenance and repair onto APCOA. The parties used different language than in the Parking Garage Lease, and specifically refer to structural repairs. In summary, Statler is responsible for repairs to the interior of the Ballroom, except for any structural repairs. APCOA is responsible for all necessary repairs to the roof and exterior walls of the premises, and all necessary structural repairs to any supporting or bearing walls, floors, beams, or columns in the interior of the premises.

15. APCOA has a fixed rental obligation to Statler for the term of the Lease for the Parking Garage in the amount of $37,000 per year, which computes to $3,083.33 per month. Statler (although it owns the premises) leases the Ballroom from APCOA over the same term for $22,500 per year, which computes to $1,875 per month.[11]

## D. The Maintenance and Repair Provision

Statler contends that the plain and ordinary meaning of the language of the Maintenance and Repair provision of this Lease includes an obligation on APCOA to do all repairs, whether structural or not, and regardless of the cost or at what point during the lease term the repairs are appropriate or necessary. Statler relies on the interpretation of the Lease as a whole as a clear indication that structural repairs are included in the Maintenance and Repair provision. APCOA contends that the general rule is that in the absence of a specific contractual provision, commercial lessees, such as APCOA, are not responsible for making substantial or structural repairs to leased premises.

The court does not find APCOA's arguments to be persuasive. APCOA relies heavily on the case of *Mach v. Accettola* (1996), 112 Ohio App.3d 282, 678 N.E.2d

---

11. It was difficult for the court to determine the rental amount from its review of the lease documents. Attached to its cross-motion for partial summary judgment, however, APCOA has included an affidavit which describes the rental arrangement. The affidavit recites the rental figures mentioned above and indicates that rather than exchanging checks, the practice of the parties has been for APCOA to issue one monthly check to Statler for rent for the Parking Garage, in the net amount of $1,208.33. The court considers this to be an item ascertainable from a review of the Lease as a whole.

617. In *Mach,* however, there are a number of factors that distinguish it from the Statler situation. For example, in *Mach,* which involved a dispute over a roof repair, the court was dealing with a five-year lease, the roof was already in poor condition at the commencement of the lease, the repair provision related to the lessee did not contain the terms "replacement" or "replace," and the court noted that it was construing the lease against the lessor, since the lessor had drafted it.

The court finds similar distinguishing factors in *Call v. Lavati Chevrolet Buick, Inc., supra,* another case relied upon by APCOA. In *Call,* the lease required the tenant to keep the premises "in good condition and repair, including any necessary replacements * * *." The lease involved was a three-year lease drafted by the lessor, and at the conclusion of the lease, the lessor contended that the lessee was responsible for the cost of new heaters, a new roof, repaving the parking lot, and repairing catch basins. The cost of such repairs was substantial. The court construed the lease against the lessor and found that the tenant was not liable for such repairs. The court interpreted the precise language and concluded that it did not require the lessee to *make* replacements, but required the lessee only to maintain any replacements. This decision was based on a review of the lease as a whole. If the language had been different and the lessee had been required to make any replacements or renewals, the result could have been different. The court finds similar distinguishing factors in other cases relied on by APCOA.

The court finds many of the cases relied upon by APCOA to be result-oriented cases, in which the court finds in favor of a tenant, primarily based on the fact that the lease is for a short-term period. Since courts often find it inequitable to impose substantial repair costs on a lessee of a short-term lease, they interpret the lease against the lessor on the basis that the lessor drafted it (which is often the case). Alternatively, courts conclude that the language of the lease is not specific enough to impose the obligation on the tenant or, based on a reading of the lease as a whole, the obligation belongs to the lessor.

An example is *Mid–Continent Life Ins. Co. v. Henry's, Inc.* (1974), 214 Kan. 350, 520 P.2d 1319, which is not persuasive authority for APCOA's position. In that case, when the wall of an adjoining building was removed, it exposed the wall of the building subject to the lease, and this wall, which had previously been protected, was not constructed according to the building code; it required immediate improvement to protect the building against the elements. Ultimately, the court found the lessor responsible for the cost of such improvements. The language of the lease in that case required the lessee to "maintain" the exterior of the premises. The only language regarding replacement and renewal did not relate to the building itself. The court concluded that these particular improvements were not within the contemplation of the parties at the time the lease was

executed and that there was no express statement in the lease regarding liability for such improvements. Viewing the lease and other extrinsic circumstances as a whole, the court imposed liability for improvements onto the lessor.

Another case relied on by APCOA is *Expert Corp. v. La Salle Natl. Bank* (1986), 145 Ill.App.3d 665, 99 Ill.Dec. 657, 496 N.E.2d 3, which involved the wall of a building that was "bowing." The language of the lease in this case, considered as a whole, is not as specific as the lease in the Statler situation. The court placed the responsibility for replacing this wall onto the lessor. The words "replacements and renewals" are not found in this lease provision. The court concluded that although the lease did contain a clause which made the lessee "generally responsible for repairs," because the required repairs in this case involved "extraordinary or unforeseen future events not within the contemplation of the parties at the time the lease was executed," the obligation for such repairs falls on the lessor. The Statler Parking Garage, however, does not involve extraordinary or unforeseen future events not within the contemplation of the parties. Nor does it involve alterations, additions, or improvements. The housing court action regarding the Statler situation is not analogous to cases involving unforeseen improvements ordered by a governmental authority. See, e.g., *Kaufman v. Shoe Corp. of Am.* (1960), 24 Ill.App.2d 431, 164 N.E.2d 617; *Hollywood Building Corp. v. Greenview Amusement Co.* (1942), 315 Ill.App. 658, 43 N.E.2d 566.

In *Mobil Oil Credit Corp. v. DST Realty, Inc.* (Mo.App. 1985), 689 S.W.2d 658, there are key facts that are different from the Statler situation. These include the fact that at the time Mobil leased the building and Parking Garage, it was already beginning to deteriorate. The concrete spalling conditions had started prior to the time Mobil took possession. The court's decision to impose responsibility for these repairs onto the lessor was based on the specific terms of the lease, which was not as specific as that found in the Statler lease.

By contrast, the court finds the reasoning and analysis in *Washington Univ. v. Royal Crown Bottling Co.* (1990), *supra*, to be compelling. In that case, the court reviewed the many Missouri cases on the exact same issue that is present in the Statler case. In distinguishing two of the Missouri cases that interpreted leases as requiring the lessor to be responsible for structural repairs, the court stated:

"The differing approaches of Ridley and Mobil indicate that there is no general rule which applies to the circumstances found in the short term leases. Both cases reached the same result, finding that the tenant did not have an obligation to make structural repairs. Both cases fall within the general observation that where the lease is for a short term and the costs of repair are more than the aggregate rent over the term, courts are reluctant to construe 'repair' to include major structural repairs. 1 M. Friedman on Leases, Section 10.601 at 6555–56

(3rd ed.1990). Furthermore, neither case establishes a broad rule which can be extended to the very different circumstances presented by long term net leases."

The same can be said for many of the Ohio cases in this area. Most of these cases present circumstances which are far different from those present in the Statler case. The lease documents for the Statler Parking Garage present unique circumstances. Based on the court's thorough analysis and review of this area of law, the court finds the real issue to be not, as APCOA suggests, whether a general covenant of repair in a lease requires a tenant to make substantial or structural repairs. Rather, the issue of whether language of the Maintenance and Repair provision in this case, *i.e.,* "all necessary or appropriate repairs, replacements and renewals," the other language of that provision, and a reading of the lease documents as a whole, imposes upon APCOA an obligation to perform substantial or structural repairs to the Parking Garage. APCOA seems to suggest that the obligation for substantial or structural repairs cannot be shifted to a tenant unless the words "substantial or structural" are used in the lease provision. The court does not find this reasoning persuasive. Such an interpretation would prohibit the court from applying the plain and ordinary terms of this lease provision in the context of a review of the lease documents as a whole.

■ A term or phrase found in a residential or short-term commercial lease may be interpreted differently than that same term or phrase when used in a long-term net lease for a commercial building. Much depends on the reading of the lease as a whole, and the rules of interpretation that apply, such as whether the lease is being interpreted against the drafter of it. The court could conceive of a situation in which the phrase "repairs, replacements and renewals" is interpreted differently than in the Statler lease, due to the other factors that must be considered, such as the balance of the language of the repair covenant in the lease, the reading of the lease as a whole, the length of the lease, the condition of the premises at the commencement of the lease, to name a few. Therefore, it cannot be stated, as a matter of law, that the use of the term "repair" or "repairs, replacements and renewals" always includes or always excludes substantial or structural repairs.

*Washington Univ. v. Royal Crown Bottling Co., supra,* involved a twenty-five-year lease for several commercial buildings which were not new at the time the lease commenced. After eleven years of the lease term had expired, the roof needed major repair. The tenants contended that they were responsible only for ordinary repairs, not for structural repairs. The court resolved the issues regarding interpretation of the lease based on a declaratory judgment action. The court found it very significant that it was a twenty-five-year lease, the lessee was in control of the entire premises, the rent did not increase during the term of

the lease, and the lessee was required to pay for insurance. While the cases cited by Statler and APCOA contain a variety of fact situations, with varying lease language, the *Royal Crown* case is most analogous to the Statler situation in both of these areas.[12]

### E. Definitions of the Operative Terms

The parties have spent a lot of time and effort debating the meaning of the word "repair." While the court is not necessarily confused by that term, a brief review of some of the definitions is helpful in understanding the term as it is used in repair covenants in leases. It is common practice to resort to dictionaries as the best source for establishing the ordinary meaning of contractual terms. *Rite Aid of Ohio v. Marc's Variety Store* (1994), 93 Ohio App.3d 407, 638 N.E.2d 1056; *Andrews v. Tax Comm.* (1939), 135 Ohio St. 374, 21 N.E.2d 106.

In Black's Law Dictionary (5 Ed.1979) 1167, the term "repair" is defined as follows:

"to mend, remedy, restore, renovate. To restore to a sound or good state after decay, injury, dilapidation or personal destruction. The term contemplates an existing structure or thing which has become imperfect, and means to supply in the original existing structure that which is lost or destroyed, and thereby restore it to the condition in which it originally existed, as near as may be."

Some Ohio courts have relied on the definition of "repair" as used in Webster's New International Dictionary. In *Verplanck v. Morgan* (1948), 55 Ohio Law Abs. 574, 90 N.E.2d 872, the court stated:

" 'Repair' * * * means '(1) To restore to a sound or good state after decay, injury, dilapidation or partial destruction. * * * (3) To Remedy, heal, make right, or mend. * * * ' " See, also, *Mountaineer Euclid, Inc. v. Western Cas. & Sur. Co.* (1969), 19 Ohio App.2d 185, 48 O.O.2d 328, 250 N.E.2d 768.

APCOA contends that, in cases involving the scope of a tenant's repair obligation, the term "repair" cannot include a "structural" repair or a "substantial" repair unless those terms are specifically used in the lease provision. Such a suggestion would alter the plain and ordinary meaning of the term "repair."

---

**12.** There is more than one basis on which APCOA could be responsible for structural repairs. Even if APCOA were correct in its interpretation of the Lease, the inquiry would not end at that point. APCOA admits that it is obligated to do at least ordinary repairs, or repairs required to keep the premises safe during the term of the Lease. Statler alleges that APCOA has failed to do these ordinary repairs, has failed to keep the premises safe, and that the failure to perform the ordinary repairs has resulted in the substantial damage and, perhaps, structural damage, now present in the Parking Garage. If Statler is correct, APCOA would be responsible for such structural repairs on that basis. *Washington Univ. v. Royal Crown Bottling Co., supra.* This issue is not a subject of the present motions for summary judgment.

Words such as "structural," "substantial," or "ordinary" are modifiers that are sometimes used in connection with the word "repair." The lack of such modifiers in a lease provision does not change the plain and ordinary meaning of the term "repair." In *Washington Univ. v. Royal Crown Bottling Co., supra,* the court analyzed this issue as follows:

"'Repair' has been defined as '[t]o mend, remedy, restore, renovate. To restore to a sound or good state after injury, dilapidation, or partial destruction.' *Black's Law Dictionary* 1167 (Rev. 5th Ed.1979) [other citations omitted]. Thus, the usual and ordinary meaning of repair does not exclude a repair that is structural in nature."

This court agrees that the plain and ordinary meaning of the term "repair" does not exclude any particular type of repair, whether it is deemed to be "structural," "substantial," "major," "ordinary," or "normal." If something is deteriorating or is in an unsafe condition, then it is in need of repair. This is not to say that the use of the term "repair" in a repair covenant in a lease always includes structural or substantial repairs. Whether that term is limited in any way depends upon the particular language used and a review of the lease as a whole.

A review of the Lease as a whole dictates this court's conclusions in this case. Immediately after the term "repair" are the terms "replacements and renewals." The operative words are that the Lessee (APCOA) is required, "at its own expense" to "make all necessary or appropriate repairs, replacements and renewals thereto." As previously stated, because this Lease is not ambiguous, the court's function is to apply the meaning of this provision, not to interpret it. Each word in this clause is used for a particular purpose, and each has its own plain and ordinary meaning.

The term "replace" was defined as follows in Webster's Third New International Dictionary of the English Language Unabridged (3 Ed.1965) 1925:

"to place again: restore to a former place, position or condition * * * to take the place of: serve as a substitute for or successor of * * *. To put in place of: provide a substitute or successor for * * *. REPLACE implies supplying a substitute or equivalent for someone or something, after something is lost, worn out, broken, dismissed, destroyed, or otherwise no longer usable."

This term has a more expansive meaning than the term "repair." It includes the complete substitution for something after it has been destroyed or is no longer usable.

The final term in the primary sentence that defines APCOA's repair obligation in this Lease is the term "renewal." The dictionary definition of the term "renew" is "[t]o make new or as if new again; restore." American Heritage

Dictionary. In the case of *Knickerbocker Bldg. Serv., Inc. v. Phillips* (1984), 20 Ohio App.3d 158, 20 OBR 192, 485 N.E.2d 260, the court distinguished between the terms "repair" and "renewal" as follows:

"Repair frequently involves a renewal of a subordinate part. It is a restoration by renewal or replacement of subsidiary parts of a structure. As distinguished from repair, renewal is a reconstruction of the entirety or a substantial part of the whole. [Citations omitted.]"

Each one of these terms has its own meaning. The use of the term "replacements" and "renewals" clearly expands the obligation of the lessee in this case in terms of the types of work that it must perform on the garage.

APCOA's obligation in this lease provision is to make "all necessary or appropriate" repairs, replacements, and renewals thereto. The parties do not agree on the meaning of these terms either. The term "appropriate" has a dictionary definition of meaning "suitable, fit or proper." Webster's Third New International Dictionary of the English Language Unabridged (3 Ed.1965) 106. The court reviews the words "necessary or appropriate" together. The use of the word "appropriate" encompasses items that should be done to the premises, but may not be necessary. The court finds the plain and ordinary meaning of these terms to be straightforward. It does not find persuasive APCOA's suggestion that the term "necessary" limits the obligations of the Lessee. To suggest that "necessary" repairs, replacements, and renewals limits the obligation of the Lessee is contrary to the plain and ordinary meaning of the term. If the term "necessary or appropriate" were considered to be a limitation, it would exclude only repairs, replacements, and renewals that are unnecessary or inappropriate. There is nothing in the term "necessary or appropriate" that would relieve APCOA of the obligation to perform structural or substantial repairs if that obligation is otherwise indicated by the lease documents as a whole. On the contrary, this phrase is one of the factors, taken from a reading of the lease documents as a whole, which indicates that APCOA has assumed the obligation for structural or substantial repairs.

### F. Other Relevant Provision of the Lease Documents

The maintenance and repair provision of the Lease goes on to provide:

"In case of any material damage or destruction of such improvements or any material part thereof, Lessee [APCOA] * * * will, at its expense, and whether or not insurance proceeds, if any, shall be sufficient * * * restore, repair or rebuild the same. * * * "

This sentence is significant in applying the meaning of this provision, and in the context of the Lease as a whole. The court has not found any other case cited by either of the parties in which the lessee has been required to rebuild the premises

in the event that they are destroyed. This is a fact unique to this case. The court finds the plain and ordinary meaning of this sentence to be obvious, and significant. APCOA contends, however, that this sentence limits the previously stated obligation to make necessary or appropriate repairs, replacements, and renewals. The court does not find such an interpretation to be an application of the plain and ordinary meaning of the terms of the Lease provision.

## G. Equitable Factors

APCOA contends that it should not be required to make the repairs demanded by Statler because those repairs are not necessary to maintain the garage for the balance of the Lease term, and that those repairs would provide Statler with a new building. Statler contends, on the other hand, that if APCOA had been more attentive to its obligations during the previous years of the Lease, the garage would not require such extensive work at this time.

With respect to the quality of the repairs, the Lease provision states that "all such repairs, replacements and renewals shall be of a quality at least equal to that of the original work." There is no dispute that the original work was new construction. This is not a case in which APCOA leased an existing building that was already subject to deterioration, as is the situation in many of the cases cited to the court. The original work would have been high quality construction. There is nothing in this sentence that would dilute APCOA's obligation to provide repairs equivalent to new construction.

One of the reasonableness factors advanced by APCOA relates to the amount of money already spent on repairs and the amount of rent that has been paid. Clearly, the amount of rent paid by APCOA for the Parking Garage is low by today's standards. What is significant, however, is that it is a fixed amount that has remained unchanged over the life of the Lease. Clearly, it would not have been unusual to have periodic rent increases stated in the lease or increases based on inflation and/or the Consumer Price Index. Those factors are not contained in this Lease, and APCOA has received the benefit of a fixed rental over the last thirty-four years.

While the rental remains fixed, any increases in revenue, whether from increased usage of the garage or increases in the charges for parking, belong exclusively to APCOA. The record indicated that the revenue to APCOA from the Parking Garage is substantial, compared to the rent. Based on the revenue produced by the Parking Garage, the amount of the proposed repairs, whether they are $3,600,000 as suggested by Statler or slightly more than $1,000,000 as proposed by APCOA, does not impose any unreasonable obligation on APCOA.[13]

---

13. It is significant that APCOA has admitted the cost of repairs to exceed $1,000,000. The court views this admission as evidence of a breach of the Amendment to Lease provision

A reading of the lease documents as a whole indicates an intention by the parties that the Parking Garage will be returned to Statler in the year 2005. The court does not credit the assertion by APCOA that the Parking Garage is beyond its useful life. Even if it were, however, the court does not believe that APCOA's obligations to provide repairs, replacements, and renewals would somehow be diluted or lessened. Taken as a whole, it is very difficult to ascertain what repair obligation APCOA acknowledges. For example, APCOA seems to admit that it has an obligation to keep the garage in a safe and operable condition during the term of the Lease. On the other hand, APCOA contends that is has complied with the Maintenance and Repair Provision of the Lease. The facts indicate otherwise. The housing court has stated its concern that the Parking Garage is not safe and apparently does not consider it to be in operable condition.

## H. The Absence of a Surrender Clause

A review of the Lease as a whole indicates that there is no surrender clause in this Lease. In the absence of a surrender clause, a lessee is under a duty at common law to return the premises in substantially the same condition as when they were received, reasonable wear and tear excepted. *Wilson v. Monroe Twp. Bd. of Trustees* (Oct. 9, 1995), Madison App. No. CA95–03–010, unreported, 1995 WL 591147. The common-law duty is similar to the statement of the obligation found in most surrender clauses. The lack of a surrender clause in this Lease has no impact on the repair obligation.

Under Ohio law, a covenant to repair and a surrender clause are considered to be separate and distinct clauses. One imposes a duty to make repairs, and the other imposes a duty to leave the premises in good repair at the end of the lease. *McKinney v. White Sewing Machine Corp.* (1964), 32 O.O.2d 306, 200 N.E.2d 596. The lack of a repair covenant in a lease would be significant. Clearly, however, the Lease in this case has such a covenant, and the law prohibits the injection of an ordinary wear and tear exception into the repair covenant.

## IV. Conclusions of Law

The court has examined the maintenance and repair clause in this Lease in great detail, including the plain and ordinary meaning of the terms used in that clause. The court has also examined the maintenance and repair clause in the context of the entire Lease read as a whole and the circumstances reflected in the Lease as a whole. Based on this review and analysis, the court finds that the maintenance and repair clause is unambiguous and that the parties intended, and

---

requiring the property to be repaired and maintained. Clearly, had APCOA repaired and maintained the property in a reasonably timely manner, there would not be repairs required today in such a large amount.

the Lease so reflects, that the Lessee (APCOA) assumes all costs of repairs and maintenance on the premises, including the cost of substantial or structural repairs. Nothing in the Lease dilutes or eliminates APCOA's obligation to perform these repairs due to the length of time left on the Lease term or due to the fact that the effect of such repairs may be that they last beyond the expiration of the Lease term. The court does not find any indication in the lease documents, considered as a whole, that APCOA is permitted to return the Parking Garage to Statler in a useless condition.

The court recognizes that the parties disagree on the scope of the repairs required to fix the Parking Garage. APCOA has represented to the court that it is just now embarking on a program to perform repairs to the Parking Garage costing in excess of $1,000,000. Statler contends that its expert has estimated $3,600,000 as the amount required to fix the garage. The court cannot resolve the issue of damages on these motions for summary judgment.

The court notes, however, that the damages sought by Statler are only part of the relief requested. Statler also seeks to evict APCOA from the Parking Garage based on a breach of the Lease for failure to repair the garage. The fact that the court has now interpreted the Lease provision does not excuse any failure to maintain the premises prior to this date. The existence of the housing court case indicates that APCOA has breached the Lease.

Generally, forcible entry and detainer actions move expeditiously. This aspect of the case should be resolved immediately. It has also been brought to this court's attention, through the housing court case, that there are concerns that the condition of the Parking Garage could be a threat to the safety of the persons who use that garage. The notice of violation issued by the city of Cleveland Building Department indicates "hazardous conditions" and that "the concrete ceiling surfaces are deteriorated, crumbling and are in a hazardous condition." Based on the meaning of the Lease, APCOA breached the Lease by allowing the Parking Garage to deteriorate to that condition.

APCOA contends that there are other issues related to the forcible entry and detainer aspect of this case, such as waiver. Both sides accuse the other of being silent about the repair obligations for many years. Be that as it may, the notice of default issued by Statler to APCOA was in December 1995, nearly two years ago. The notice of violation issued by the city of Cleveland Building Department was in January 1997. The court finds it difficult to believe that parties who have been arguing about the maintenance and repair clause for several years have somehow waived their rights under the Lease. The affidavit of Carl Milstein indicates that tenants at the Statler Office Tower have made complaints about crumbling concrete falling on cars for more than the past several years and that

if those complaints were made to Statler, they were passed along to the APCOA employees at the garage.

This court is very concerned about the possibility that this Parking Garage contains hazardous conditions that could be a threat to public safety. The court feels that these problems cannot be addressed properly until the issue of possession is resolved. As a result, the court will require the forcible entry and detainer aspect of this case to proceed immediately. The parties are ordered to be prepared to proceed on this aspect of the case within thirty days. It will be APCOA's obligation to be prepared to present any defenses it may have to the forcible entry and detainer action.

The court will bifurcate from the forcible entry and detainer action all other issues in the case. Primarily, these issues will relate to damages. The court will expect the parties to be prepared to proceed with this aspect of the case promptly upon conclusion of the forcible entry and detainer proceedings.

It is so ordered.

*Judgment accordingly.*