NEW MARKET ACQUISITIONS, LTD., Plaintiff,

v.

POWERHOUSE GYM, et al., Defendants.

No. C2–99–185.

United States District Court, S.D. Ohio, Eastern Division.

June 21, 2002.

Dan Jay Binau & Mark Coco, Harris, McClellan, Binau & Cox, Columbus, OH, for Plaintiff.

Zora E. Johnson, Joseph Hickey & Andrew Lusk, Dykema & Gossett, Bloomfield Hills, MI, Gregory E. Sutton, Bruce Leroy Ingram, Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendants.

### OPINION AND ORDER

HOLSCHUH, District Judge.

Plaintiff, New Market Acquisitions, Limited ("New Market"), filed suit to recover damages for breach of a commercial lease. In a Memorandum & Order dated March 29, 2001, the Court found that Defendants were liable for damages arising from the breach of the lease and for Plaintiff's attorney fees. The parties then waived their right to a jury trial concerning the scope of damages recoverable under the terms of the lease and the guaranty, agreeing instead to submit factual stipulations and trial briefs. On December 5, 2001, the Court heard expert witness testimony from Robert Weiler and Thomas Kaliker. The parties then submitted post-trial briefs.

The Court, having considered the pleadings, trial briefs, and factual stipulations filed by the parties, the expert witness testimony presented on December 5, 2001, and the post-trial briefs of counsel, hereby enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

The facts in this case are essentially undisputed. In mid–1996, Eric Berger, President of ESB One Berger Enterprises ("ESB"), sought to open a health club in Columbus, Ohio. William Dabish of Power-house Gym International, Inc., a health club franchise, agreed to grant ESB a license to operate a Powerhouse Gym. On September 27, 1996, ESB signed a ten-year lease (the "Powerhouse Lease") with NYLIFE Realty Partners I ("NYLIFE"), New Market's predecessor-in-interest. ESB agreed to rent 14,886 square feet in the New Market Shopping Center to house the gym. As an incentive to induce ESB to enter into the Powerhouse Lease, NYLIFE paid ESB $600,000 to be used for tenant improvements. (Factual Stip. ¶ 7). As a prerequisite for the execution of the Powerhouse Lease, NYLIFE asked Eric Berger to obtain a personal guaranty on the lease. Defendant William Dabish agreed to sign a guaranty and did so on October 1, 1996. The guaranty is also signed by Defendants Norman Dabish, Ibatsam Dabish, and Nouha Dabish.

On May 14, 1997, NYLIFE assigned the Powerhouse Lease to the plaintiff in this case, New Market. Shortly thereafter, in August of 1997, ESB began to fall behind on its rent payments, defaulting on its obligations under the lease. In June of 1998, New Market began negotiating with California Fitness I, Inc. ("California Fitness") to re-let the premises. On September 17, 1998, New Market filed suit in the Franklin County Court of Common Pleas (Case No. 98CVE–07–7221), naming ESB and the Dabishes as defendants. New Market sought possession of the premises, future rent, back rent, interest, and penalties, as well as other direct and consequential damages stemming from the breach.

On December 15, 1998, New Market entered into a new lease with California Fitness (the "California Fitness" Lease). The California Fitness Lease, to be effective July 1, 1999, covers 27,500 square feet, approximately twice the square footage of the Powerhouse Lease. California Fitness would not have entered into the California

Fitness Lease had it covered only the 14,-866 square feet then occupied by the Powerhouse Gym. (Factual Stip. ¶¶ 8–9). In order to accommodate California Fitness's demand for more space, New Market had to undertake some major remodeling of the mall.

The California Fitness facility is comprised of:

- 14,886 square feet previously occupied by Powerhouse Gym
- 4,493 square feet previously common areas and hallways
- 4,147 square feet previously occupied by Raisin Rack (which was relocated to another space)
- 2,031 square feet of previously vacant space; and
- 1,843 square feet originally occupied by Candlesticks

On February 1, 1999, ESB and New Market entered into a settlement agreement. ESB agreed to vacate the premises on or before May 1, 1999, and to pay $153,650.52 to New Market in exchange for a release of liability. The settlement agreement reserved New Market's right to pursue all other available remedies against the Dabishes as guarantors. The Dabishes then removed the case to federal court on the basis of diversity jurisdiction and filed a third party complaint against ESB seeking indemnification in the event they were found liable.

The parties agree that New Market incurred the following expenses in connection with the California Fitness Lease, and that these expenses were typical in nature and ordinary in amount:

(1) On February 24, 2000, New Market contributed $385,000 to California Fitness's construction costs;

(2) On August 3, 1999, New Market paid $120,000 in equipment costs;

(3) On December 1, 1999, New Market paid California Fitness $10,400 to re-place materials removed by ESB from the premises;

(4) In two equal payments made on August 26, 1999 and February 9, 2000, New Market paid a total of $68,750 in brokerage commissions;

(5) No later than July 29, 1999, New Market paid $90,966 to relocate another tenant, Raisin Rack, to make additional square footage available for California Fitness; and

(6) No later than October 5, 1999, New Market paid $48,636 for landlord on-site work.

(Factual Stip. ¶¶ 4–6, 10–12).

## CONCLUSIONS OF LAW

Plaintiff claims to be entitled to the following damages arising out of ESB's breach of the Powerhouse Lease:

| | |
|---|---|
| $ 366,590.73 | Back rent |
| $ 315,400.00 | Incentive Payments to California Fitness |
| $ 68,750.00 | Brokerage Commissions |
| $ 48,636.00 | On site work by Landlord |
| $ 90,966.00 | Relocation of Raisin Rack (existing tenant) |

TOTAL: $1,090,342.73

Of that amount, Defendants concede that they are liable only for the following:

| | |
|---|---|
| $ 142,105.43 | Back rent |
| $ 37,215.00 | Brokerage Commissions |
| $ 25,022.76 | Renovation Expenses |

TOTAL: $ 204,343.19

At issue in this case is which categories of expenses claimed by New Market are recoverable either under the express terms of the Powerhouse Lease or under common law. The parties agree that the amounts expended were typical in nature and reasonable in amount; the sole question is who should bear the cost. Plaintiff claims that Defendants are liable for $1,090,342.73 pursuant to the broad remedy provisions in the Powerhouse Lease. In the alternative, Plaintiff argues that recovery is available under Ohio common law because all of its claimed damages flowed from the breach and from New

Market's efforts to mitigate its damages. Defendants deny that the remedy provisions contained in the Powerhouse Lease are broad enough to encompass the scope of damages sought by New Market. Defendants further argue that the Powerhouse Lease supersedes all of New Market's common law rights.

The relevant sections of the Powerhouse Lease read as follows:

**17.2  Remedies**

Upon the occurrence and continuance of an event of default, Landlord, without notice to Tenant in any instance (except where expressly provided for below) may do any one or more of the following:

(a) with such judicial process as may be required by law, enter the Premises, change the locks and/or take possession of any and all goods, inventory, equipment, fixtures and all other personal property of Tenant . . . ;

(b) perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform . . ., the cost of which performance by Landlord . . . shall be deemed Additional Rent and shall be payable by Tenant to Landlord upon demand;

(c) elect to terminate the tenancy created by this Lease by giving notice of such election to Tenant, and may reenter the Premises, without the necessity of legal proceedings, if permitted by law, and may remove Tenant and all other persons (if Tenant is still in possession) and property from the Premises . . . ;

(d) elect to terminate this Lease;

(e) exercise its rights in asserting a landlord's lien which tenant acknowledges is created by this lease;

(f) exercise any other legal or equitable right or remedy which it may have.

Notwithstanding the provisions of clause (b) and regardless of whether an event of default shall have occurred, Landlord may exercise the remedy described in clause (b) without any notice to Tenant if Landlord, in its good faith judgment, believes it would be injured by failure to take rapid action or if the unperformed obligation of Tenant constitutes an emergency.

Any costs and expenses incurred by Landlord (including, without limitation, attorney's fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be Additional Rent and shall be repaid to Landlord by Tenant upon demand.

**17.3  Remedies Cumulative**

No reference to any specific right or remedy shall preclude Landlord from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity. Each month that the default continues shall be considered a new event of default. No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial Rent during the continuance of any such breach, shall constitute a waiver of any such breach, agreement, term, covenant or condition. No waiver by Landlord of any breach by Tenant under this Lease or of any breach by any other Tenant under any other Lease of any portion of the Shopping Center shall affect or alter this Lease in any way whatsoever.

### 17.4 *Damages*

Whether or not this Lease is terminated by Landlord pursuant to Section 17.2, Tenant nevertheless shall remain liable for any Rent and damages which may be due or sustained by Landlord and all reasonable costs, fees and expenses including, but not limited to, leasing fees, attorneys' fees, renovation costs and any other expenses incurred by Landlord in pursuit of its remedies hereunder.

Landlord may relet the Premises or any part thereof, alone or together with other Premises, for such term or terms (which may be greater or less than the period which otherwise would have constituted the balance of the Term) and on such terms and conditions (which may include concessions or free Rent and alterations of the Premises) as Landlord, in its absolute discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any Rent due upon such releting. The act of releting the Premises shall constitute a termination of this Lease under Section 17.2(d), and the effective date of such termination shall be the date the new tenant is open for business.

If this Lease is terminated pursuant to Section 17.2, and this termination may occur after the Landlord has pursued other remedies, the Landlord shall upon such termination be entitled to recover an amount equal to the damages, consequential as well as direct, sustained by the Landlord as a result of the Tenant's default, and in addition thereto, an amount equal to the Rent and Additional Rent provided in this Lease for the residue of the Term hereof, less any offset arising from the Landlord's ability to relet the Premises.

(Pl.Ex.1).

The disputed categories of expenses include: (A) back rent; (B) incentive payments to California Fitness; (C) brokerage commissions; (D) landlord's on-site work; and (E) relocation of Raisin Rack. As to each category, the Court will discuss which damages are recoverable by New Market.

### A. Back Rent

■ The first paragraph of § 17.4 of the Powerhouse Lease states that the Tenant shall remain liable for any Rent which may be due. New Market claims to be entitled to $366,590.73 in back rent. The parties have stipulated that, pursuant to the terms of the Powerhouse Lease, this is the amount that is owed, including liquidated damages and interest through July 31, 2001.[1] (Factual Stip. ¶ 1). The parties have further stipulated that the $366,590.73 may be subject to a setoff of $153,650.52, the amount paid to New Market by ESB pursuant to the February 1, 1999 settlement agreement between them. (Factual Stip. ¶ 3).

Even though the parties have stipulated that the back rent is $366,590.73, they apparently agree that Defendants, in so stipulating, did not waive their right to challenge how the back rent should be calculated. (Ex. B to Defs.' Post–Hrg. Brief). According to Defendants, the entire amount of the $153,650.52 settlement should be applied to the back rent that was due on February 1, 1999, the date of the settlement agreement because, as of that date, New Market had not yet incurred any damages other than missed rent pay-

---

1. Liability for back rent was cut off as of July 1, 1999, the date the California Fitness Lease took effect.

ments. If the settlement were to be applied in this manner, the amount of interest that would continue to accrue each month would be drastically reduced, resulting in a finding that Defendants are liable for only $142,105.43 in back rent.

The Court, however, rejects Defendants' argument that the $153,650.52 New Market received from its settlement with ESB must be deemed payment for back rent and applied to the principal amount owed on February 1, 1999. As New Market notes, nothing in the settlement agreement required New Market to apply the funds it received from ESB to back rent. Both New Market and ESB were obviously aware that ESB's liability could far exceed a claim for back rent under the broad remedy provisions of the Powerhouse Lease and, in the lawsuit pending in the common pleas court when the settlement was made, New Market was seeking far more in damages than back rent.

Furthermore, the settlement funds were paid by ESB over a two-year period; the final payment was not made until June 1, 2001. (Pl.Ex.17). By the time New Market received the bulk of the settlement funds, it had incurred numerous other expenses as a result of ESB's breach. For these reasons, the Court finds that Defendants are not entitled to have the $153,650.52 setoff applied to the back rent owed as of February 1, 1999. Instead, the setoff should be applied to the bottom line, against all damages to which New Market is entitled as determined by the Court in this Opinion and Order. Pursuant to § 1.2(m) and § 5.7(a) of the Powerhouse Lease,[2] interest at the rate of 18% per year continues to accrue from July 31, 2001.[3]

## B. Incentive Payments to California Fitness

In order to induce California Fitness to enter into the California Fitness Lease, New Market paid California Fitness $515,400.00 in "incentive payments."[4] This is the largest category of expenses claimed by New Market and, by far, the most hotly contested. These "incentive payments" fall into three categories and are broken down as follows:

| | |
|---|---|
| $ 385,000 | Contribution to California Fitness's construction costs |
| $ 120,000 | Equipment allowance |
| $ 10,400 | Replacement costs for materials removed by ESB from the premises[5] |
| TOTAL: $ 515,400 | |

The parties and their experts all agree that incentive payments of this type are quite common in the commercial lease industry. In fact, as noted above, NYLIFE gave ESB $600,000 in similar incentive payments to induce ESB to enter into the Powerhouse Lease, which covers only one-half of the square footage of the California

**2.** Section 5.7(a) provides that Rent which has not been paid seven days after it is due "shall bear interest at the Default Rate from the first date due until paid." Section 1.2(m) defines the "Default Rate" as "[a]n annual rate of interest equal to eighteen percent (18%). If 18% exceeds the interest rate allowable by law, then the highest interest rate allowable by law."

**3.** As previously noted, the parties have stipulated that the "back rent, including liquidated damages and interest through July 31, 2001, due plaintiff ... is $366,590.73." (Factual Stip. ¶ 1).

**4.** As noted earlier, the parties have stipulated that California Fitness would not have entered into the lease without these incentive payments.

**5.** While the parties have included this $10,400 as part of the "incentive payments" paid to California Fitness, this expense appears to be of a different nature than the construction costs and equipment allowance. The need to replace materials improperly removed by ESB would appear to constitute a renovation of the premises, *i.e.*, a restoration of the leased premises to the condition it should have been in when vacated by the tenant.

Fitness Lease. The parties have stipulated that the $515,400 in incentive payments New Market paid to California Fitness was ordinary in amount. (Factual Stip. ¶¶ 4–6). New Market notes that the net effect of the $515,400 in incentive payments was to reduce Defendants' liability by $1.3 million; future rent due under the Powerhouse Lease would have been $1.8 million.[6] (Factual Stip. ¶ 2).

At the hearing on December 5, 2001, New Market presented the expert witness testimony of Robert Weiler, who has extensive experience in the area of commercial real estate. Mr. Weiler testified that it was his belief that New Market "acted reasonably to mitigate what could have been a $1.8 million expenditure." (Tr. at 15). He further testified that the incentive payments given to California Fitness were "considerably less than what you could expect." (Tr. at 21). Defendants, in turn, presented the expert witness testimony of Thomas Kaliker, a commercial real estate appraiser. Mr. Kaliker concurred that the amount New Market offered California Fitness in incentive payments was commercially reasonable. (Tr. at 80–81, 95).

Since the parties agree that the incentive payments made to California Fitness were typical in nature and reasonable in amount, the only issue is who should bear the cost. For the reasons set forth below, the Court finds that Defendants are liable for $10,400 in costs incurred by New Market in replacing materials removed by ESB from the premises. However, Defendants are not liable for the $385,000 New Market contributed to California Fitness's construction costs, or the $120,000 equipment allowance.

■ When ESB vacated the premises, it removed $10,400 worth of materials that New Market was required to replace before California Fitness moved in. Under the first paragraph of § 7.3 of the Powerhouse Lease, trade fixtures owned by the Tenant remain the Tenant's property "provided Tenant shall not be in default of this Lease." Defendants concede that, because ESB was in default, New Market would have been entitled, pursuant to § 17.2(a) of the Powerhouse Lease, to impose a lien on the materials in question. However, Defendants argue that since ESB removed these materials several months after the guaranty relationship was severed by the February 1, 1999 settlement agreement between ESB and New Market, Defendants can no longer be held liable.

The Court rejects this line of reasoning. Defendants have cited no language in the settlement agreement, the Powerhouse Lease, or the guaranty that would release them from liability for these items. The guaranty was a "continuing guaranty" and the guarantor's liability "shall in no way be affected, modified, or diminished ... by reason of any dealings ... occurring between Landlord and Tenant, including ... any ... settlements." (Pl.Ex. 2 ¶ 3). Since the materials in question were apparently "trade fixtures" and New Market was entitled to place a lien on them because ESB had defaulted on its obligations, the Court finds that Defendants are liable for the $10,400 in costs incurred by New Market for replacing these materials.

■ However, as to the $385,000 in construction costs and the $120,000 equipment allowance, which appear to be true incentive payments, the Court finds no basis for holding Defendants liable. It must be noted at the outset that New Market has never claimed that it is attempting to recover the $600,000 in incentive payments

---

6. This is based on what is, in the Court's view, the unfounded assumption that New Market would have been unable to find a replacement tenant for the entire remaining term of the lease.

paid to induce ESB to enter into the Powerhouse Lease. At the hearing on December 5, 2001, Plaintiff's counsel confirmed that New Market was not seeking to recover the $600,000 in incentive payments paid to ESB but not fully recouped because of ESB's default. (Tr. at 50–51). The only claim New Market has made is for the incentive payments it paid to California Fitness.

The Court finds no basis, either in the express terms of the Powerhouse Lease or in the common law, for holding Defendants liable for the construction cost and equipment allowance incentive payments New Market made to induce California Fitness to enter into the California Fitness Lease. In the Court's view, the fact that incentive payments like these are commonplace in the industry does not necessarily mean that New Market is entitled to recover these costs from Defendants in this case.

■ The Court will first examine those portions of the Powerhouse Lease cited by New Market in support of its claim. Of course, under Ohio law, any ambiguities in the lease language setting forth recoverable damages must be strictly construed against New Market because NYLIFE, New Market's assignor, was the drafter of the lease. *See Woodcreek Ass'n, Inc. v. Bingle*, 73 Ohio App.3d 506, 510, 597 N.E.2d 1153, 1156 (1991). New Market contends that the broadly worded remedy and damages provisions contained in §§ 17.2, 17.3, and 17.4 of the Powerhouse Lease render Defendants liable for the $505,000 in incentive payments. The Court disagrees.

Section 17.2 of the Powerhouse Lease, entitled "Remedies," sets forth the remedies available to the landlord in the event of a default. Under these provisions, the Landlord may evict the tenant, take possession of and sell the tenant's property, terminate the tenancy and the lease, assert a landlord's lien, and exercise any other

legal or equitable rights or remedies. The final paragraph of § 17.2 states, "Any costs and expenses incurred by Landlord (including, without limitation, attorney's fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be Additional Rent and shall be repaid to Landlord by Tenant upon demand."

In the Court's view, the construction cost and equipment allowance incentive payments New Market paid to California Fitness are not recoverable under § 17.2 of the Powerhouse Lease. That subsection sets forth the actions the landlord may take to actually terminate the lease if the tenant defaults, *i.e.*, evict the tenant, change the locks, assert a landlord's lien, take possession of and sell the tenant's inventory or personal property. Therefore, even though the final paragraph permits the landlord to recover expenses incurred in enforcing "any of its rights or remedies," this language must be interpreted in its appropriate context and read to limit recovery of costs to those expenses incurred by the landlord in actually terminating the Lease. Once New Market terminated the Powerhouse Lease and ESB vacated the premises, this section of the lease became largely inapplicable. For these reasons, the Court finds that the above-described incentive payments made to California Fitness are outside of the scope of "remedies" contemplated in § 17.2 of the Powerhouse Lease.

The question of whether these incentive payments are recoverable is more appropriately analyzed under § 17.4 of the Powerhouse Lease. That section, entitled "Damages," expressly sets forth what damages are recoverable by New Market in the event of a default. New Market notes that its assignor, NYLIFE, already paid $600,000 in incentive payments to ESB to create a stream of rental income. It argues that it should not be required to

pay another $505,000 in incentive payments to California Fitness in order to replace that stream of income because, but for ESB's default, New Market would not have incurred this additional expense. (Tr. at 49–50). New Market claims to be entitled to recover this money pursuant to the broad remedy provisions of § 17.4.

The Court will analyze each paragraph of § 17.4 separately. The first paragraph of § 17.4 states that ESB "shall remain liable for any *Rent and damages* which may be due or sustained by Landlord." (emphasis added). The incentive payments paid to California Fitness clearly do not constitute "Rent" that can be charged to Defendants. The term "damages" is not specifically defined in the Powerhouse Lease. However, for the reasons stated below, the Court finds that the above-described incentive payments made to induce California Fitness to enter into the California Fitness Lease do not constitute recoverable damages under the terms of the Powerhouse Lease.

The first paragraph of § 17.4 also states that ESB shall be held liable for all reasonable expenses incurred by the Landlord, "including, but not limited to, leasing fees, attorneys' fees, *renovation costs* and *any other expenses incurred by Landlord in pursuit of its remedies hereunder.*" (emphasis added). New Market first asks the Court to find that the incentive payments in question are "renovation costs" for which Defendants may be held liable.

The Court finds that the construction cost and equipment allowance incentive payments do not constitute "renovation costs" under the terms of the Powerhouse Lease. Paragraph 1.1 of the Powerhouse Lease states that "[a]ll words contained in this Lease are to be given their plain, ordinary meaning ..." The plain, ordinary

meaning of the word "renovate" means "to restore to a former state." *Webster's Third New Int'l Dictionary* 1922–23 (1976).[7]

In *Belich v. Westfield Ins. Co.*, No. 99–L–163, 2001 WL 20751 (Ohio App. 11th Dist. Dec. 29, 2000), in construing the terms of an insurance policy, the court distinguished between "renovation" and "remodeling." *Id.* at *3. It noted that the act of converting a party store into a sports bar could not be considered "renovating;" it was more appropriately characterized as "remodeling." *Id.* "Remodel" means "to alter the structure of; remake." *Merriam–Webster's Collegiate Dictionary* <http://www.m-w.com/cgi-bin/dictionary> (accessed May 16, 2002).

Likewise, this Court finds that the work done to convert the space formerly occupied by Powerhouse Gym into the space now occupied by California Fitness is best characterized as "remodeling." While Powerhouse Gym occupied only 14,886 square feet, California Fitness occupies nearly double that space. In order to accommodate California Fitness's need for more space, New Market had to reconfigure a portion of the mall. Some of the additional square footage consists of space previously occupied by other mall tenants or used for common purposes like hallways. Walls needed to be knocked down and moved and space needed to be generally reconfigured; these activities go far beyond what would commonly be considered "renovation."

Furthermore, even if the Court were to find that this was "renovation," it is unreasonable to believe that the parties intended that Defendants would be liable for renovating twice as much space as ESB had leased. The Powerhouse Lease spe-

---

**7.** As noted earlier, the cost of replacing materials improperly removed by ESB when it vacated the premises would appear to be recoverable by the landlord as a "renovation" expense. *See infra*, note 5.

cifically defines the "Premises" as "Tenant's portion of Landlord's Building containing approximately fourteen thousand eight hundred eighty-six (14,886) leasable square feet." (Pl.Ex.1, § 1.2(c)). While it may be reasonable to hold Defendants liable for those expenses necessary to restore 14,866 square feet to its former state, the Court refuses to find that they are liable for twice the square footage of the original lease.

■ The Court also finds that the principle of *ejusdem generis* precludes a finding that Defendants are liable for extensive remodeling. "[W]here an enumeration of specific things is followed by some more general word or phrase, such general word or phrase should be held to include only things of the same general nature as those specified." *Kay v. Pennsylvania R. Co.*, 156 Ohio St. 503, 505, 103 N.E.2d 751, 753 (1952). Therefore, even though the list of potential damages enumerated in § 17.4 such as "renovation costs" is preceded by the phrase "including but not limited to," and followed by the phrase "and other expenses incurred by Landlord in pursuit of its remedies hereunder," Defendants' liability is limited to categories of damages of the same general nature as those specified. While the lease contemplates some renovation being necessary to restore 14,866 square feet to its former condition, it does not contemplate large-scale remodeling of twice that area. For these reasons, the Court finds that the first paragraph of § 17.4 does not render Defendants liable for the construction cost and equipment allowance incentive payments made to California Fitness.

The second paragraph of § 17.4 permits New Market to "relet the Premises or any part thereof, alone or together with other Premises ... and on such terms and conditions (which may include *concessions or free Rent and alterations of the Premises*) as Landlord, in its absolute discretion, may determine." (emphasis added).[8] While this paragraph does permit New Market to make certain concessions, or offer free rent and alter the premises in connection with reletting them, it does not expressly impose liability for all such concessions or alterations on the defaulting tenant. Had the landlord wanted to hold its tenants liable for these kinds of expenses, language to that effect could have been specifically included in the lease. *See Westbourne Dev. Co. v. Sigma Sys. Health Mgmt. Specialists, Inc.*, No. 91AP–856, 1992 WL 11197 at *1 (Ohio App. 10 Dist. 1992) (tenant liable for "any and all expenses incurred by the Landlord in connection with such reletting, including, without limitation, brokers' commissions, legal fees and the expenses of any decorating, repairs or alterations that the Landlord deems it necessary or appropriate to make in connection with such reletting."). Since the Powerhouse Lease is silent on this point, the Court may assume that the parties intended to exclude it. *See Statler Arms, Inc. v. APCOA, Inc.*, 92 Ohio Misc.2d 45, 54, 700 N.E.2d 415, 421 (1997).

Furthermore, it seems clear that the language reference to "the Premises" refers to the 14,886 square feet which constituted the space of the Powerhouse Lease. Although paragraph 17.4 permits reletting of "the Premises ... alone or together with other Premises," and provides that the reletting may include "concessions or free Rent and alterations of the Premises," it would appear that the reference is to concessions or free Rent and alterations of the subject matter of the Powerhouse

8. As noted earlier, § 1.2(c) of the Powerhouse Lease expressly defines "premises" as "Tenant's portion of Landlord's Building containing approximately 14,886 leasable square feet."

Lease and *not* to concessions or free Rent and alterations of an area that encompassed twice the square footage of the Powerhouse Lease. If, however, there is ambiguity regarding this language, it should be construed, as noted earlier, against the drafter of the lease, Plaintiff's predecessor in interest.

The third paragraph of § 17.4 states that ESB is liable for "an amount equal to the damages, *consequential as well as direct,* sustained by the Landlord as a result of the Tenant's default." (emphasis added). The parties agree that consequential damages are recoverable only if they were foreseeable to the parties at the time of contracting. *See Hadley v. Baxendale,* 9 Ex. 341, 354, 156 Eng.Rep. 145, 151 (1854); *Crawford v. ITT Consumer Financial Corp.,* 653 F.Supp. 1184, 1193 (S.D.Ohio 1986) ("The touchstone for establishing a claim for consequential damages is a showing that such damages were foreseeable."). New Market argues that because ESB was paid $600,000 in incentive payments when it signed the Powerhouse Lease, it was certainly foreseeable that New Market would make similar incentive payments to a new tenant in the event of ESB's default.

While it may be a common business practice to provide incentive payments in order to induce new tenants to enter into commercial leases, it is not a common business practice to charge these incentive payments back to a defaulting tenant. Instead, these incentive payments are generally amortized over the life of ·the new lease. In fact, Plaintiff's own expert, Robert Weiler, testified at the December 5, 2001 hearing that such incentive payments would have been factored into the California Fitness Lease and recouped over the life of the lease. (Weiler Dep. at 78–80,

125–26; Tr. at 51–53). When asked whether he had ever heard of these types of incentive payments being charged back to a previous tenant, Mr. Weiler testified that, while those costs may have been factored into settlement negotiations, he had never seen an instance where those numbers were isolated and charged back to a defaulting tenant.[9] (Tr. at 34–35).

Likewise, Defendants' expert, Thomas Kaliker, testified that amortizing the cost of incentive payments over the life of a lease is a "common business practice." (Tr. at 86–87). He explained:

Tenant improvement allowances are usually costs borne by the landlord and are usually amortized over the lease by the new tenant. So, in negotiating deals, landlords will look at a situation, and say, okay, I am going to have to spend "X" dollars to rebuild a space for the new tenant's needs, so, therefore, I am going to charge a rent that will allow me to amortize them to amortize those costs over the future projection of that lease. (Tr. at 72).

Mr. Kaliker further testified that, in his experience, costs of this type, incurred when a tenant defaults on a lease, are always borne by the landlord. (Tr. at 73). In fact, Mr. Kaliker testified that the value of commercial property drops when a tenant is in default because the landlord will have to incur costs associated with the default, such as rebuilding the space for a new tenant, leasing commissions, and loss of rent during the interim period. (Tr. at 63).

Plaintiff correctly points out that the fact that neither expert witness was personally aware of any situation where incentive payments provided to a new tenant

---

**9.** At the December 5, 2001 hearing, Mr. Weiler admitted that, while he was asked to provide his opinion concerning the commercial reasonableness of New Market's mitigation efforts, he was not asked to offer an opinion concerning who should pay for the incentive costs. (Tr. at 46, referring to Weiler Dep. at 84).

had been charged back to a defaulting tenant does not necessarily determine the outcome in this case. However, the fact that neither expert witness, both with extensive commercial real estate experience, had ever heard of incentive payments being charged back to a defaulting tenant is certainly relevant in determining what the parties intended and what damages were foreseeable. Since both experts agree that the common practice is to amortize incentive payments over the life of a lease, the Court finds that it was not foreseeable at the time of contracting that Defendants would be liable for the incentive payments made to California Fitness. It is very clear to the Court that the parties did not contemplate nor intend that New Market could recover twice for the same expenses, once from Defendants, and a second time from California Fitness. For this reason, the Court finds that these incentive payments are not recoverable as consequential damages under the third paragraph of § 17.4.

However, even if the original parties to the Powerhouse Lease intended that, upon default, the tenant would be liable for the cost of "concessions" or "free Rent" or "alteration of the premises," the type of payments in dispute, a contribution of $385,000 for California Fitness's construction costs and $120,000 for equipment costs, do not appear to the Court to fall within the language of the Powerhouse Lease. These payments—over a half-million dollars—were clearly incentive payments made to induce California Fitness to enter into a lease with New Market. Nothing in the terms or conditions of the California Fitness Lease identifies these payments as "concessions," and there is no provision for "free Rent." Furthermore, while the parties to the Powerhouse Lease may have contemplated some cost to alter the original premises, they clearly did not contemplate, as previously noted, a complete large-scale remodeling of a substantial portion of the mall, including enclosure of common areas and an expansion of the leased premises to twice its original size. For these reasons, the Court finds that no language in the Powerhouse Lease entitles New Market to recover the $385,000 in construction costs or the $120,000 equipment allowance paid to California Fitness as incentive payments to induce it to enter into the California Fitness Lease.

New Market has stipulated that it is making no claim for future rent in light of the California Fitness Lease; liability for future rent was cut off when the California Fitness Lease became effective. (Factual Stip. ¶ 2). However, at the December 5, 2001 hearing, after both experts testified that incentive payments like those made to California Fitness are generally amortized over the life of a lease, Plaintiff's counsel argued that, if the Court finds that the incentive payments were, in fact, amortized over the life of the California Fitness Lease and would be recouped in that manner, then New Market should be permitted to convert its claim for "tenant incentives" into a claim for "future rent." (Tr. at 104). Counsel reasoned that if, for example, California Fitness were paying $10 per square foot on the California Fitness Lease, but $2 per square foot of that was being charged to recoup the incentive payments New Market had paid up front, then the true rent would be only $8 per square foot. Since this amount is less than the rent ESB had been paying, counsel therefore argued that New Market should be able to recover the difference as "future rent."

Defendants object to Plaintiff's attempt to amend its claim to assert damages based on this new theory. Defendants note that they have retained experts, and engaged in discovery based solely on Plaintiff's previously asserted theory—that, but for ESB's default, New Market would not have had to make incentive pay-

ments to California Fitness, and that since these damages flow from the breach and were foreseeable, they are recoverable as consequential damages. The Court agrees that Defendants would be prejudiced if Plaintiff were permitted to assert this new theory of recovery for the first time at the final hearing on this issue, especially in view of the express stipulation that liability for future rent was cut off when the California Fitness Lease became effective.

■ New Market next argues that, even if the Court finds that the incentive payments are not recoverable under the express terms of the Powerhouse Lease, they are recoverable under common law as a reasonable cost of mitigation. As an initial matter, the Court rejects Defendants' arguments that the express terms of the Powerhouse Lease supersede any common law right of recovery that may otherwise be available to New Market. Under § 17.2 of the Powerhouse Lease, upon ESB's default, New Market had the right to terminate the lease and "exercise any other legal or equitable right or remedy which it may have." Furthermore, § 17.3 reserves New Market's right to pursue any other remedies available at law or in equity: "No reference to any specific right or remedy shall preclude Landlord · from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity."

■ Under Ohio common law, when a tenant defaults, a landlord has a duty to mitigate its damages by attempting to relet the premises. *See Dennis v. Morgan,* 89 Ohio St.3d 417, 419, 732 N.E.2d 391, 394 (2000). Furthermore, the landlord is generally entitled to recover reasonable expenses incurred in mitigating its damages. *See F. Enterprises, Inc. v. Kentucky Fried*

*Chicken Corp.,* 47 Ohio St.2d 154, 158–63, 351 N.E.2d 121, 124–27 (1976); *Hines v. Riley,* 129 Ohio App.3d 379, 383–84, 717 N.E.2d 1133, 1135–36 (Ohio App. 4th Dist. 1998). In this case, as noted earlier, the parties have stipulated that the incentive payments made to induce California Fitness to enter into the lease were typical in nature and reasonable in amount. Mr. Weiler specifically testified that New Market's mitigation efforts were reasonable under the circumstances. (Tr. at 15).

Nevertheless, in the Court's view, under common law, New Market is not entitled to recover the $505,000 in incentive payments from Defendants. As to the $385,000 New Market contributed toward California Fitness's construction costs, this expense is not attributable to Defendants because the permanent reconfiguring of the mall necessary to accommodate California Fitness's demand for additional space constitutes a capital improvement and ultimately benefits New Market.[10] Numerous courts have held that major structural changes of this type are not recoverable as mitigation expenses. *See C.D. Stimson v. Porter,* 195 F.2d 410, 414 (10th Cir.1952) ("substantial and permanent" changes redounding to the benefit of the lessor not recoverable as mitigation expenses); *In re Parkview–Gem, Inc.,* 465 F.Supp. 629, 638 (W.D.Mo.1979) (lessor not entitled to recover mitigation expenses incurred in making long-term capital improvements since those expenditures ultimately benefitted lessor); *Pioneer Trust & Savings Bank v. Zonta,* 96 Ill.App.3d 339, 51 Ill.Dec. 731, 421 N.E.2d 239, 245 (1981) (money spent on remodeling was not recoverable because it "constituted a capital improvement which would increase the value of the premises"); *In re Andover Togs, Inc.,* 231 B.R. 521, 537 (Bankr.

10. The fact that this money was paid to California Fitness rather than to a particular con-

tractor makes no difference since the end result was the same.

S.D.N.Y.1999) (long-term capital improvements which "yield a betterment to the leasehold," such as construction of common corridor, may not be included in a computation of damages for breach of lease); *In re Stewart's Properties, Inc.*, 41 B.R. 353, 356 (Bkrtcy.D.Hawai'i 1984) (lessors not entitled to recover expenses for long-term capital improvements that ultimately benefitted themselves).

Since California Fitness now occupies double the square footage formerly occupied by Powerhouse Gym, New Market actually increased its rental income by terminating ESB's lease. While most of the space now occupied by California Fitness was previously occupied by other tenants, 4,493 square feet previously consisted of common areas and hallways. Therefore, the extensive remodeling resulted in additional leasable space for New Market. Because the construction costs constituted capital improvements that ultimately benefitted New Market, they are not chargeable as mitigation expenses.

Furthermore, while New Market may have agreed to contribute $385,000 toward construction costs and $120,00 toward additional equipment in order to induce California Fitness to enter into the California Fitness Lease, these particular payments are not recoverable under common law as reasonable mitigation expenses for another reason. In the Court's view, these incentive payments are more properly construed as the means to induce California Fitness to enter into a lease rather than as foreseeable mitigation expenses. As noted earlier, expert witness testimony in this case establishes that incentive payments of this type are factored into the rent and recouped over the life of the lease. While mitigation expenses such as advertising, brokerage fees, and renovation costs were certainly foreseeable, it was not foreseeable that a half-million dollars in incentive payments to a new tenant would be charged back to the defaulting tenant.[11] Under these circumstances, the Court finds that, while the California Fitness incentive payments were reasonable expenses incurred by New Market, they are a-cost that must be borne by New Market, not by Defendants.

## C. Brokerage Commissions

■ Under § 39 of the California Fitness Lease, New Market agreed to pay $2.50 per square foot in brokerage fees. (Pl.Ex.4). Since the California Fitness Lease encompassed 27,500 square feet, this resulted in a total commission of $68,750. New Market claims that Defendants are liable for this entire amount under the first paragraph of § 17.4 of the Powerhouse Lease which imposes liability on the Tenant for "all reasonable costs, fees and expenses including, but not limited to, leasing fees" incurred by the Landlord in pursuit of its remedies.

The Court finds that Defendants are liable for $37,215 in brokerage fees. This figure is based on the square footage of the Powerhouse Lease, *i.e.*, 14,886 × $2.50. While it is perfectly reasonable to hold Defendants liable for the leasing fees incurred by New Market in reletting the "premises" as defined in § 1.2(c) of the Powerhouse Lease, in the Court's view it was not the intention of the parties that Defendants be responsible for double that amount simply because the new tenant wanted twice as much space.

---

11. While ESB and Defendants may have been aware that incentive payments are sometimes made to induce a prospective tenant to enter into a lease (indeed, ESB was itself the recipient of such a payment), there is no evidence in the record to indicate an awareness that such payments would be charged back to a previous tenant in default.

## D. Landlord's On-site Work

■ When New Market entered into the California Fitness Lease, it agreed to perform certain on-site work at its own expense. (Pl.Ex.4, § 33). New Market now seeks reimbursement for the cost of that work, a total of $48,636. It claims to be entitled to these expenses both pursuant to § 17.4 of the Powerhouse Lease and as a reasonable cost of mitigation. Defendants concede that they are liable for $25,022.76, the amount expended by New Market to repair a hole in the roof and service the air conditioning. However, Defendants contend that they are not liable for the following:

▶ $ 3,984.00    Installing a demising wall at hall corridor and closing in openings to CompUSA
▶ $ 1,223.25    Sign installation
▶ $18,406.50    Electrical rewiring

For many of the same reasons Defendants are not liable for the incentive payments paid to California Fitness, the Court finds that Defendants cannot be held liable for the costs of installing a demising wall and a sign or for electrical rewiring. These costs, incurred by New Market as part of the remodeling, are not recoverable under § 17.4 of the Powerhouse Lease. As with the incentive payments that were to be used to offset California Fitness's construction costs, these additional construction-type expenses cannot be construed as either "Rent" or "damages." New Market was required to install a demising wall and to rewire the electricity because it was altering the structure of the mall. The costs incurred in doing so are outside the scope of recoverable "renovation" costs. As additional consideration for the California Fitness Lease, New Market agreed to perform certain on-site work; however, there is no basis for holding Defendants liable for this additional consideration. The Court rejects New Market's argument that these expenses are recoverable are consequential damages. At the time of contracting, it was not foreseeable that a new tenant would require twice as much space or that ESB would be asked to pay for the construction costs incurred in accommodating that request.

The Court also finds that these expenses are not recoverable as reasonable mitigation expenses. As with the other incentive payments, these types of expenses constitute capital improvements that ultimately benefit New Market. New Market agreed to pay these expenses to induce California Fitness to enter into the California Fitness Lease. While there was no expert testimony concerning this issue, the Court assumes that, like the incentive payments, the cost of this on-site work is factored into California Fitness's rental payments and will be recouped over the life of that lease. Again, costs of this nature are outside the scope of typical mitigation expenses. For these reasons, the Court finds that Defendants are liable only for $25,022.76, the cost of repairing the hole in the roof and servicing the air conditioning unit.

## E. Relocation of Existing Tenant

■ New Market incurred $90,966 in expenses in relocating Raisin Rack, an existing tenant, in order to make room for California Fitness. The Court finds that this cost must be borne by New Market and is not chargeable to Defendants, either under the terms of the Powerhouse Lease or under common law. Again, there is no language in the Powerhouse Lease that would impose liability on Defendants for this type of expense. Relocating an existing tenant cannot be considered a "renovation" cost as that term is commonly defined. This cost is not recoverable as consequential damages because it was not foreseeable that, if ESB defaulted, New Market would incur costs of this nature in order to accommodate a new tenant who

needed twice as much space. For these reasons, the Court finds that the expense of relocating Raisin Rack is outside the scope of liability as set forth in the Powerhouse Lease.

Neither is the expense recoverable under common law as a reasonable mitigation expense. While New Market may have decided to relocate Raisin Rack in order to accommodate California Fitness's demand for additional space, this decision ultimately benefitted New Market because it created more leasable space. By relocating Raisin Rack and expanding the space available to California Fitness, New Market was able to increase its rental income. As noted earlier, these types of capital improvements are not chargeable as mitigation expenses.

### CONCLUSION

For the reasons set forth above, IT IS HEREBY ADJUDGED, ORDERED AND DECREED AS FOLLOWS:

1. Defendants are liable to Plaintiff, New Market Acquisitions, Ltd., in the amount of $ 439,228.49 plus prejudgment interest at the rate of 18% per year accruing from the dates set forth below. This total judgment is subdivided as follows:

> $ 366,590.73    for Back Rent (this figure includes liquidated damages and interest accrued through July 31, 2001) plus prejudgment interest at the rate of 18% per year from July 31, 2001 [12]

> $ 37,215.00    for Brokerage Commissions, plus prejudgment interest at the rate of 18% per year from February 9, 2000 [13]

> $ 25,022.76    for Renovation Expenses, plus prejudgment interest at the rate of 18% per year from October 5, 1999 [14]

> $ 10,400.00    Replacement Materials, plus prejudgment interest at the rate of 18% per year from December 1, 1999 [15]

2. The total liability is subject to a setoff of $153,650.52, the amount of the settlement agreement between New Market and ESB.

3. A hearing on the outstanding issue of recoverable attorney fees will be held on Friday, July 19, 2002 at 1:00 p.m.

4. A Final Judgment, for purpose of any appeal, will be entered following a resolution of the attorney fee issue.

**IT IS SO ORDERED.**

---

12. The parties have stipulated that this figure represents the back rent owed through July 31, 2001. (Factual Stip. ¶ 1).

13. The parties have stipulated that the brokerage commission fees were paid in two equal installments—$34,375 on August 26, 1999 and $34,375 on February 9, 2000. (Factual Stip. ¶ 10). The Court has found that Defendants are liable for only $37,215 of that total amount. The Court finds that the interest on this amount should accrue from February 9, 2000, the date New Market incurred brokerage costs equal to or greater than the recoverable amount.

14. The parties have stipulated that these renovation expenses were paid no later than October 5, 1999. (Factual Stip. ¶ 12).

15. The parties have stipulated that payment for these replacement materials was made on December 1, 1999. (Factual Stip. ¶ 6).