NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0240n.06

Case No. 24-3838

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
May 12, 2025
KELLY L. STEPHENS, Clerk

|  |  |
|---|---|
| PAMELA K. PIRL; SHANNON R. PIRL, | ) |
| Plaintiffs - Appellants, | ) |
| | ) |
| v. | ) |
| | ) |
| RICE DRILLING D, LLC, successor in interest to Equinor USA Onshore Properties, Inc., | ) |
| Defendants - Appellees. | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

O P I N I O N

Before: COLE, McKEAGUE, and RITZ, Circuit Judges.

**McKEAGUE, Circuit Judge.** This case involves a contract dispute. Plaintiff-Appellant Pamela Pirl and her now-deceased husband Joseph Pirl leased their property to Rice Drilling D, LLC so that Rice could drill for oil and gas. To facilitate drilling, the Pirls negotiated and entered a surface use agreement with Rice to build, operate, and maintain a well pad and related facilities. However, the resulting infrastructure on the property hindered the Pirls' ability to use the land for their cattle business. The Pirls sued Rice for breach of contract, trespass, and quiet title. The district court granted Rice summary judgment. We **AFFIRM.**

**I.**

Plaintiff Pamela Pirl owns about 146 acres of real property in Monroe County, Ohio. She and her husband Joseph operated a cattle business on the property. In 2012, Pamela and Joseph

entered an oil, gas, and coalbed methane lease with Defendant Rice Drilling's predecessor. Under the lease, the Pirls granted Rice exclusive "right, title[,] and interest" to "all oil and gas" underlying the leased premises in exchange for twenty percent of the resulting oil and gas sales proceeds. Lease, R. 29-2 at PageID 323–24. An addendum to the lease included a restriction that "[n]o well pad shall exceed 10 acres unless approved by Lessor in writing" along with a requirement that "[l]essor[s] will be compensated for the use of the surface on a per acre basis at a rate of $5,000.00 per acre utilized." *Id.* at PageID 330.

In line with these requirements, the parties negotiated and entered into a surface use and damages settlement agreement that gave Rice "the exclusive right to build, operate, and maintain a well pad, and appurtenant equipment and facilities[.]" Surface Use Agreement, R. 36-1 at PageID 959. Pamela, Joseph, and their son Shannon Pirl participated in the negotiations, but only Pamela and Joseph signed the agreement. The agreement contains the following granting language:

> NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Operator to Surface Owner, the receipt and sufficiency of which are hereby acknowledged, **Surface Owner does hereby grant, convey and assign to Operator the exclusive right to build, operate, and maintain a well pad, and appurtenant equipment and facilities** (whether above or below the surface) upon the Lands, pipelines to transport gas, condensate, oil and any associated hydrocarbons from the well pad and other lands, temporary above-ground pipelines to transport water to and from the well pad or to other well pads in the area (see below), and the right of ingress and egress across the Lands, temporary storage for equipment that is in transport from one well pad to other well pads and further described and/or depicted, **for informational purposes only, on the plat attached hereto as Exhibit "A" and made a part hereof by reference** . . .

*Id.* (emphasis added). As described, the agreement included a topography plat labeled "Exhibit 'A'" describing the "Surface Use Plans" of the Pirl property. *Id.* at PageID 964. This plat was "made a part" of the agreement "by reference" but "for informational purposes only[.]" *Id.* at PageID 959.

2



*Id.* at PageID 964. The plat shows a 3.2-acre well pad, two topsoil stockpiles, filter fabric fencing, and a 14.6-acres limit of disturbance.

In addition, the agreement provides that "[n]ew fences and relocated fences will be gated and locked and Surface Owner will be provided keys to said locks." *Id.* at PageID 961. The agreement also requires that the "[p]ad site . . . be fenced." *Id.* Finally, it states that "an area of approximately 8 acres of pasture will be fenced off for cattle grazing," the location of which was left for the parties to decide.[1] *Id.*

---

[1] In 2018, parties executed the First Amendment to the agreement which deletes this provision from the agreement. First Amendment, R. 29-8 at PageID 365. The Pirls relieved Rice of its duty to fence the 8 acres in pastureland in exchange for a payment of $160,000. *Id.*

The parties executed the agreement in 2014. To compensate for any "damages[,] . . . , loss of use, crops, timber or other value" that would result from the operations, Rice paid the Pirls $73,000, which equates to $5,000 per acre within the limit of disturbance. Surface Use Agreement, R. 36-1 at PageID 959. Construction commenced the same year.

But all was not well. Joseph raised several complaints to Rice during construction. These complaints included flooding issues on the property, road restoration problems, issues with fencing, and the presence of a rockpile. In October 2016, once construction wrapped up, Joseph identified several locations on an as-built survey—which depicted the well site as it existed at the time—and provided photographs detailing his issues at those locations.



Email, R. 29-6 at PageID 344; Existing Conditions Plan Markup, R. 29-7 at PageID 355. Relevant here are numbers 5 and 7, located south of the well pad. At number 5, Joseph claimed that "large boulders uncovered from the site were not removed . . . but instead were left exposed or packed into the fill of the [t]opsoil stockpile[.]" Existing Conditions Plan Markup, R. 29-7 at PageID 360. At number 7, Joseph claimed "that there was supposed to be a wide access path around the entire well pad for his tractor and livestock." *Id.* at PageID 362. But "the [t]opsoil [s]tockpile . . . increased during construction" causing this path "to neck down just beyond the silt fence" and "narrows down 7 to 8 feet in several locations between the silt fence and his existing barbed wire fence." *Id.* The resulting chokepoints made it difficult for the Pirls to move cattle around the construction area. The Pirls wanted Rice to move the fence to ensure a wider path to allow for the easy movement of cattle. Rice and the Pirls were unable to reach a solution on these issues before Joseph passed away in 2018.

In 2020, Shannon resumed the conversation. First, he complained that large rocks were rolling down the topsoil stockpile into pastureland and hindering the use of farm equipment. To resolve this issue, Rice proposed to move the rockpile further north-northeast from its current location away from the fence line. Next, to create a wider path to move cattle, Shannon requested that Rice move the fence—located south of the topsoil stockpile—further north by fifty feet. Rice initially thought it could accommodate Shannon's request, but later realized that by relocating the fence as Shannon requested, Rice would risk violating its obligations to Ohio Department of Natural Resources (ODNR). Topsoil is required to restore the well site after the well is no longer operational, and Rice was obligated to ODNR to maintain the topsoil stockpile for this purpose. According to Rice, Shannon's proposed fence line would encroach on the topsoil stockpile, leaving portions of the stockpile unprotected by the fence, and thereby risk Rice's ability to fulfil its

5

obligations to ODNR. Instead, Rice offered two alternative ways to relocate the fence, neither of which moved the fence by fifty feet. Shannon did not agree to either alternative.

Pamela and Shannon initiated this lawsuit in the Monroe County Court of Common Pleas before Rice removed the case to federal court. They sued for breach of contract, trespass, and quiet title. They claimed that Rice violated the agreement by (1) placing fencing outside of the limit of disturbance, which interfered with Shannon's ability to herd cattle, and by (2) maintaining topsoil in a manner contrary to terms of the agreement. They sought both damages and injunctive relief. Rice moved for summary judgment on all claims. Rice also argued that Shannon lacked standing to bring the suit. The Pirls moved for partial summary judgment on the claims but requested a trial to determine damages.

The district court granted Rice's motion for summary judgment. The court held that Exhibit A—the topography plat—was not binding on the parties because it was incorporated into the agreement "for informational purposes only." And without Exhibit A, the terms of the agreement authorized Rice to construct the fence and maintain a single topsoil stockpile as it did. The court held that since Rice conformed with the agreement, the Pirls' claims of trespass and quiet title necessarily failed. Finally, the court held that Shannon lacked standing because he was only an incidental beneficiary to the agreement. This appeal followed.

## II.

We review a district court's grant of summary judgment de novo. *Bluegrass Materials Co., LLC v. Freeman*, 54 F.4th 364, 369 (6th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence and the inferences that may be drawn from it are construed in the light most favorable to the nonmoving party. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the evidence is such that no reasonable jury could return a verdict for the plaintiff, then summary judgment is appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

"We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Parties agree that Ohio law governs the dispute here. In applying Ohio law, we must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). If the issue has not been directly addressed, we must "anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court." *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). "Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Id.*

### III.

The Pirls raise four issues on appeal. First, they argue that Rice breached the agreement. Second, they argue that Shannon has standing to bring this suit because he was an intended beneficiary of the agreement. Third, they claim they are entitled to quiet title relief because Rice exceeded the parameters of the agreement. Finally, they claim that Rice is trespassing on Pamela's property by exceeding the limits set forth in the agreement.

### A.

To determine whether Rice breached the agreement, we must decide whether Exhibit A binds the parties. Under Ohio law, the construction of a written contract is a matter of law for the

court. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 148 (Ohio 1978). When interpreting a contract, "our role is to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). To do so, "[w]e will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Id.* We generally resort to the "plain and ordinary meaning" of the contract language when deciphering this intent. *Id.*

Here, Exhibit A was "made a part" of the agreement "by reference" but "for informational purposes only[.]" Surface Use Agreement, R. 36-1 at PageID 959. As a general matter, the use of the phrase "for informational purposes only" within a contract does not create contractual liability. *See Karnes v. Doctors Hosp.*, 555 N.E.2d 280, 281–82 (Ohio 1990) (holding that an employee handbook provided with the disclaimer "for informational purposes only" did not constitute an employment contract); *see also Transcon. Ins. Co. v. Exxcel Project Mgmt., Inc.*, No. 04AP-1243, 2005 WL 2365020, at *6 (Ohio Ct. App. Sept. 27, 2005) (holding that naming a party in a contract "for informational purposes" does not make the party a third-party beneficiary). Ohio courts also tend to use the phrase to signify the absence of any contractual or other legal liability. *See, e.g.*, *Haefka v. W.W. Extended Care*, No. 01CA007863, 2001 WL 1509200, at *3 (Ohio Ct. App. Nov. 28, 2001) (holding that a nursing home was not liable for intentional infliction of emotional distress when it sent monthly billing statements to the patient's listed primary contact "for informational purposes only" even though the contact was not responsible for the charges); *Estate of LaJoie*, No. L-92-234, 1993 WL 256377, at *2 (Ohio Ct. App. July 9, 1993) (holding that notice requirements in Ohio's Rules of Superintendence for wrongful death settlements are "for informational purposes only" and that a failure to comply with those requirements does not invalidate a settlement); *Debartolo v. Portage Cty. Bd. of Comm'rs*, No. 1389, 1984 WL 7275, at *5 (Ohio Ct. App. Sept.

28, 1984) (Dahling, J., dissenting) (reasoning that a letter detailing plaintiffs' "sewer assessments and [an] approximate rate of interest to be charged if the assessments were not pre-paid" was sent "for informational purposes only" and did not constitute an "offer").

Moreover, binding the parties to the exact depictions of the plat in Exhibit A would contradict the language of the plat itself, which expressly allows for certain variations. For example, Exhibit A states that (1) "If soils present are not capable of supporting steep slopes, pad size and location may change"; (2) "All proposed elevations are approximate and relative; pad elevations may be field adjusted to balance earthwork"; and (3) "Geotech analysis required to confirm feasibility[.]" Surface Use Agreement, R. 36-1 at PageID 964. Based on this language and the fact that Exhibit A was provided "for informational purposes only," the plat represents an estimation of what the final well site would look like, not a binding set of precise specifications. *See* Dockter Dep., R. 35 at PageID 754; Oral Argument at 28:58–30:13.

The Pirls' argument to the contrary is unconvincing. They state that the plat binds the parties because Exhibit A was "made a part [of the agreement] by reference" and the use of "informational purposes only" does not take away from the incorporation. Appellant Br. 19. But this argument misses the mark. Indeed, we agree that the plat is part of the contract. But it is part of the contract "for informational purposes only," and when "plans and specifications are referred to in [a] contract for a particular specified purpose, such specifications can serve no other purpose than the one specified, and are foreign to the contract for all other purposes." *Krause v. Oscar Daniels Co.*, 22 N.E.2d 544, 547 (Ohio Ct. App. Mar. 20, 1939) (holding that "drawings" or "plans" incorporated into a contract for the "limited . . . purpose of determining quantity" of construction materials, could not be used to "govern the contractual rights of the parties" relating

to other aspects of construction such as "material, labor and methods"). Accordingly, Rice did not have to adhere to Exhibit A's specifications.

**B.**

We now proceed to the Pirls' breach of contract claims. The Pirls claim that Rice breached the agreement by (1) installing a permanent fence around the limit of disturbance; (2) installing portions of the permanent fence outside of the limit of disturbance; (3) reducing the number of topsoil stockpiles to one without Pamela's permission; and (4) putting rocks on the topsoil stockpile. We address each claim in turn.

**1.**

The Pirls first contend that Rice breached the agreement by installing a permanent fence around the limit of disturbance without seeking Pamela's permission. Appellant Br. 15. We disagree. The agreement grants Rice the "exclusive right to build, operate, and maintain a well pad, and appurtenant equipment and facilities . . . upon the Lands[.]" Surface Use Agreement, R. 36-1 at PageID 959. The agreement defines "Lands" as the entire "146.063 acre tract of land" that Pamela owns in Monroe County. *Id.* The parties agree that Rice's fence around the limit of disturbance fits within the agreement's definition of "facilities." Appellant Br. 16; Appellee Br. 11–12. When read together, these provisions authorize Rice to construct facilities anywhere on Pamela's property.

This authority is subject to two limitations—one within the oil and gas lease and the other within the agreement. First, the oil and gas lease, which preceded the agreement, requires Rice to compensate the Pirls "for the use of the surface on a per acre basis at a rate of $5,000.00 per acre utilized." Lease, R. 29-2 at PageID 330. Consistent with that rate, Rice paid the Pirls $73,000 in

exchange for using 14.6 acres. As such, Rice purchased the right to build a fence or other facilities within 14.6 acres of the Pirl property, and therefore complied with this limitation.

Second, the agreement requires Rice to "confer" with the Pirls "regarding the location of surface facilities before beginning construction." Surface Use Agreement, R. 36-1 at PageID 960. The record shows that Rice spoke with Joseph at least once before constructing the fence.

| | |
|---|---|
| Rice: | Do you know whether [Rice] talked to [Joseph Pirl] about that fence being there before it was constructed? |
| Shannon: | Repeat. |
| Rice: | Sure. Did [Rice] talk to your dad about the fence being there before they built it? |
| Shannon: | They asked about building the temporary fence. |
| Rice: | The fence that is still on the property? |
| Shannon: | Yes. |
| Rice: | Did [Rice] call it a temporary fence? |
| Shannon: | That's what it is. |
| . . . | |
| Rice: | Who else was part of that conversation? |
| Shannon: | I don't recall at this time. |
| Rice: | Were you there? |
| Shannon: | Yes. |
| Rice: | Was your father? |
| Shannon: | Yes. |

Shannon Dep., R. 29 at PageID 222–23. Because Rice paid and conferred with the Pirls, Rice complied with the agreement's requirements and was authorized to build the fence around the limit of disturbance.

The Pirls claim that the agreement requires Rice to obtain Pamela's permission before constructing the fence. Appellant Br. 15. We disagree. The agreement only requires Rice to "confer

with [the Pirls] regarding the location of surface facilities before beginning construction." Surface Use Agreement, R. 36-1 at PageID 960. While to "confer" is to merely "consult," permission requires "formal consent" or "authorization." Merriam-Webster Dictionary, Definition of "Confer", https://www.merriam-webster.com/dictionary/confer (last visited April 11, 2025); *id.*, Definition of "Permission", https://www.merriam-webster.com/dictionary/permission (last visited April 11, 2025). Accordingly, the plain language of the agreement does not require Rice to obtain the Pirls' formal consent.

The Pirls further claim that Rice only conferred with the Pirls about a temporary fence and not a permanent one. Appellant Br. 5. But we fail to see the impact of this distinction because Shannon admitted that Rice talked to Joseph about building "[t]he fence that is still on the property[.]" Shannon Dep., R. 29 at PageID 222. Whether the current fence is characterized as temporary or permanent, the parties discussed it before construction which is what the agreement requires.

The Pirls also argue that Rice did not stake the proposed location of the fence for the Pirls to observe and consent to. Appellant Br. 5. But all the agreement requires is for the parties to "confer" before construction; it is silent as to how the conference should proceed. The fact that a contract "is silent on a particular point does not make it ambiguous[,]" *Statler Arms, Inc. v. APCOA, Inc.*, 700 N.E.2d 415, 421 (Ohio Com. Pl. Oct. 17, 1997), and "[i]t is not the responsibility or function of . . . court[s] to rewrite the parties' contract[.]" *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989). Rather, the parties "are required to use good faith to fill the gap of a silent contract." *Burlington Res. Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 401 (Ohio Ct. App. Apr. 26, 1999).

The Pirls also argue that the fence prevents them from using the 14.6 acres within the limit of disturbance. Appellant Br. 22–24. But the evidence in the record does not substantiate these claims. Indeed, the Pirls retain access to the property, and the agreement requires Rice to "gate[] and lock[]" any "[n]ew fences and relocated fences" and provide the Pirls with keys, thereby ensuring they have access to the fenced-in property. Surface Use Agreement, R. 36-1 at PageID 961. But even if the Pirls lost access, Rice already compensated them for any "loss of use" by paying $73,000 under the agreement. *Id.* at 959.

In short, Rice did not breach the terms of the contract by constructing the fence around the limit of disturbance.

**2.**

The Pirls' remaining breach of contract claims are similarly unpersuasive. First, the Pirls argue that Rice breached the agreement by installing portions of the fence outside of the limit of disturbance. Appellant Br. 17. But other than the topography plat in Exhibit A, nothing in the agreement confines Rice's operations to the limit of disturbance. Since Exhibit A was incorporated "for informational purposes only," the only restriction on Rice's operations is that they be limited to 14.6 acres of land—the amount for which the Pirls were compensated. After Rice completed construction, the area of disturbance was limited to 12.0 acres total. Since the Pirls have not shown that Rice used more than 14.6 acres, the mere fact that portions of the fence go outside of the limit of disturbance as depicted in the topography plat of Exhibit A does not mean that Rice breached the agreement.

Second, the Pirls claim Rice breached the agreement by unilaterally reducing the number of topsoil stockpiles from two to one. Appellant Br. 18. Again, the topography plat in Exhibit A is the only place where there is any mention of two topsoil stockpiles. Nothing else in the agreement

requires two topsoil stockpiles. Since the plat is not binding on the parties, Rice did not breach the agreement by maintaining a single topsoil stockpile.

Third, the Pirls claim that Rice breached the agreement by placing rocks within the topsoil stockpile. Appellant Br. 18. Again, this is not a breach because the agreement does not forbid placing rocks on top of the topsoil stockpile. In fact, the agreement requires that the stockpile be "seeded and mulched to minimize run off." Surface Use Agreement, R. 36-1 at PageID 961. The rockpile helps to minimize run off by ensuring that the stockpile is stable and "has [the] integrity to hold up and actually sustain the life of the well operations." Dockter Dep., R. 35 at PageID 780–81.

Because the Pirls do not have a viable breach of contract claim, the district court properly granted summary judgment to Rice.

## C.

The Pirls' remaining arguments also fail. First, the Pirls claim that Rice is trespassing by using the property in a manner that is not permitted by the agreement. Appellant Br. 29. Trespass occurs on real property when "a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue." *Apel v. Katz*, 697 N.E.2d 600, 607 (Ohio 1998) (citation omitted). However, a claim of trespass necessarily fails if the person has contractual authority to use the property. *Beavers v. PNC Bank, Nat'l Ass'n*, No. 99773, 2013 WL 6408727, at *4 (Ohio Ct. App. Dec. 5, 2013). Here, since Rice has operated within the confines established in the agreement, it did not trespass. *See id.*

Next, the Pirls request quiet title relief for portions outside the 3.2-acre well pad claiming that Rice does not have the authority to maintain the fence around the limit of disturbance and that the Pirls have the right to access portions of property outside the well pad. Appellant Br. 28. Under

14

Ohio law, an action of quiet title "may be brought by a person in possession of real property . . . against any person who claims an interest therein adverse to him, for the purpose of determining such adverse interest." Ohio Rev. Code. § 5303.01. Again, as stated before, Rice is not violating the agreement, and the Pirls have not proffered any evidence that they have been excluded from the property. Accordingly, this claim fails as well. *See Duramax, Inc. v. Geauga Cty. Bd. of Comm'rs*, 667 N.E.2d 420, 422 (Ohio Ct. App. Oct. 16, 1995).

Finally, since the Pirls' claims fail on the merits, we need not address whether Shannon had standing to bring suit.

## IV.

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment to Rice.